THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MORRIS S. TREMAINE, as Comptroller of the State of New York, Appellant.

(Argued October 17, 1929, decided November 19, 1929.)

*William D. Guthrie* and *Edward G. Griffin* for appellant. The court below erred in holding that new matter inserted by the Legislature in the supplemental appropriation bill submitted by the Governor on March 18, and passed by it on March 28, 1929, constituted part of the items of appropriation contained in chapter 593 of the Laws of 1929 to which such new matter purported to relate. (*People ex rel. W. E. & C. Co.* v. *Metz,* 193 N. Y. 148; *People ex rel. Carter* v. *Rice,* 135 N. Y. 473; *People ex rel. Killeen* v. *Angle,* 109 N. Y. 564; *Gilbert El. R. R. Co.* v. *Anderson,* 3 Abb. [N. C.] 452; *People ex rel. Hopkins* · v. *Board of Supervisors of Kings County,* 52 N. Y. 556; *People ex rel. Devery* v. *Coler,* 173 N. Y. 103; *Rumsey* v. *N. Y. & N. E. R. R. Co.,* 130 N. Y. 88.) Assuming that the power to segregate appropriations or to approve or authorize their expenditure may be classified as a legislative function, because capable of being exercised by the Legislature itself, the function, nevertheless, cannot be delegated by it to two of its own members. (*Banto* v. *Himrod,* 8 N. Y. 483; *People* v. *Klinck Packing Co.,* 214 N. Y. 121; *Stanton* v. *Board of Supervisors,* 191 N. Y. 428; *Wynehamer* v. *People,* 13 N. Y. 378; *People* v. *Draper,* 15 N. Y. 532; *People ex rel. Burby* v. *Howland,* 155 N. Y. 270; *Matter of Davies,* 168 N. Y. 89; *Matter of Guden,* 171 N. Y. 529; *People ex rel. Devery* v. *Coler,* 173 N. Y. 103; *Village of Saratoga Springs* v. *Saratoga G., etc., Co.,* 191 N. Y. 123; *Matter of Richardson,* 247 N. Y. 401; *Field* v. *Clark,* 143 U. S. 649; *Buttfield* v. *Stranahan,* 192 U. S. 470; *Interstate Commerce Commission* v. *Goodrich Transit Co.,* 224 U. S. 194; *Hampton & Co.* v. *United States,* 276 U. S. 394; *Brown* v. *Fleischner,* 4 Ore. 132; *Saxby* v. *Sonnemann,* 318 Ill. 600.) The power of the two legislative chairmen to segregate or approve the expenditure

of appropriations made by the Legislature under the statutory provisions in question is a civil, administrative or executive function and not legislative. (*Matter of Davies*, 168 N. Y. 89; *Springer* v. *Philippine Islands*, 277 U. S. 189; *Kilbourn* v. *Thompson*, 103 U. S. 168; *Abueva* v. *Wood*, 45 Phil. 612; *Myers* v. *United States*, 272 U. S. 52; *Brown* v. *Honiss*, 74 N. J. L. 501; *State* v. *Zimmerman*, 197 N. W. Rep. 823; *McElderry* v. *Abercrombie*, 213 Ala. 289; *Abbott* v. *Commissioners of Fulton County*, 160 Ga. 657; *Board, etc., Commrs.* v. *Riley*, 194 Cal. 37.) Under the provisions of articles 4-A and 5 of the State Constitution the challenged legislation is unconstitutional and void. (*People* v. *Draper*, 15 N. Y. 532.) Practical construction has not modified the constitutional provisions discussed. (*Matter of Wendell* v. *Lavin*, 246 N. Y. 115; *Rathbone* v. *Wirth*, 150 N. Y. 459; *People* v. *Allen*, 42 N. Y. 378; *Myers* v. *U. S.*, 272 U. S. 52; *People ex rel. Broderick* v. *Morton*, 156 N. Y. 136; *People ex rel. Heinrich* v. *Travis*, 175 App. Div. 721; *Nellis* v. *State of New York*, 204 App. Div. 176.) The unconstitutional part of the statutory provisions in question is severable. (*Matter of Village of Middletown*, 82 N. Y. 196; *People ex rel. Alpha P. C. Co.* v. *Knapp*, 230 N. Y. 48; *People ex rel. Angerstein* v. *Kenney*, 96 N. Y. 294; *Skaneateles W. W. Co.* v. *Village of Skaneateles*, 161 N. Y. 154; *People ex rel. Devery* v. *Coler*, 71 App. Div. 584; 173 N. Y. 103; *State ex rel. Worrell* v. *Carr*, 129 Ind. 44; *State ex rel. Hadley* v. *Washburn*, 167 Mo. 680; *State ex rel. Tolerton* v. *Gordon*, 236 Mo. 142; *State ex rel. French* v. *Clausen*, 107 Wash. 667.

*Hamilton Ward*, Attorney-General (*Nathan L. Miller*, *John Knight* and *C. T. Dawes* of counsel), for respondent. It makes no difference whether the power to approve segregations is deemed abstractly a legislative or an administrative power, the Legislature as the all-powerful body in voting the expenditure of the people's money, can

compel the administrative department to divide lump sum appropriations into detailed schedules of proposed expenditure and require these schedules to be approved by an agency selected by the Legislature, even though some of the approving officials are members of the Legislature. . (*Village of Saratoga Springs* v. *Saratoga Gas, Electric Light & Power Co.*, 191 N. Y. 123; *Interstate Commerce Commission* v. *Goodrich Transit Co.*, 224 U. S. 194; *United States* v. *Grimaud*, 220 U. S. 506; *Field* v. *Clark*, 143 U. S. 649; *Stanton* v. *Board of Supervisors*, 191 N. Y. 428; *People* v. *Draper*, 15 N. Y. 532; *People ex rel. Simon* v. *Bradley*, 207 N. Y. 592; *Matter of Richardson*, 247 N. Y. 401; *People ex rel. Peaks* v. *Voorhis*, 243 N. Y. 420.) A member of the Legislature is not disqualified under section 7 of article 3 of the Constitution from performing the functions placed upon him by the segregation statutes. (*Stewart* v. *Mayor*, 15 App. Div. 548; *Shoemaker* v. *United States*, 147 U. S. 282.) The Governor had no power to veto section 11 of the supplemental budget bill which attached the condition that no appropriations for construction should be used for personal service except on the approval of the Governor, the Chairman of the Senate Finance Committee and the Chairman of the Assembly Ways and Means Committee. (*State* v. *Holder*, 76 Miss. 158; *Fergus* v. *Russell*, 270 Ill. 304; *Strong* v. *People*, 220 Pac. Rep. 999; *Norwell* v. *Herrington*, 122 Md. 487; *Fullmore* v. *Lane*, 104 Tex. 499; *Miller* v. *Walley*, 84 So. Rep. 466; *Taxicab Co.* v. *Standard Oil Co.*, 218 Pac. Rep. 139; *Fairfield* v. *Foster*, 214 Pac. Rep. 319.)

POUND, J. From the agreed statement of facts on which this controversy is submitted to the court it appears that the Governor transmitted to the Legislature his original itemized budget and budget bill on January 28, 1929, in accordance with article IV-A of the New York Constitution, section 2, which reads as follows:

" § 2. On or before the fifteenth day of January next

succeeding (except in the case of a newly elected governor and then on or before the first day of February) he [the governor] shall submit to the legislature a budget containing a complete plan of proposed expenditures and estimated revenues. It shall contain all the estimates so revised or certified *and clearly itemized, and shall be accompanied by a bill or bills for all proposed appropriations and reappropriations;* it shall show the estimated revenues for the ensuing fiscal year and the estimated surplus or deficit of revenues at the end of the current fiscal year together with the measures of taxation, if any, which the governor may propose for the increase of the revenues. It shall be accompanied by a statement of current assets, liabilities, reserves and surplus or deficit of the state; statements of the debts and funds of the state; an estimate of its financial condition as of the beginning and end of the ensuing fiscal year; and a statement of revenues and expenditures for the two fiscal years next preceding said year in form suitable for comparison. The governor may before final action by the legislature thereon, and not more than thirty days after submission thereof, amend or supplement the budget; he may also with the consent of the legislature, submit such amendment or a supplemental bill at any time before the adjournment of the legislature. A copy of the budget and of any amendments or additions thereto shall be forthwith transmitted by the governor to the comptroller."

In the budget bill so submitted were many lump sum appropriations, not itemized, to the administrative departments. Although the budget must contain all the estimates of proposed expenditures " clearly itemized," the Governor and the Legislature seem to be in accord in the view that the budget bill submitted by the Governor need not be itemized but that it may contain lump sum appropriations. The provisions for the Department of Law are typical. They were as follows:

" Department of Law
" Personal Service
" To permit the attorney-general to reorganize the department of law, exclusive of the appropriations made for the investigation of sale of securities and unlawful corporative activities...................... $582,250.00

" On or before June 15, 1929, the attorney-general shall file with the governor a tentative segregation of the amount hereby appropriated. Before any liability shall be incurred such segregation shall have the approval of the governor and no change shall be made in this tentative segregation during the fiscal year commencing July 1, 1929, without his approval.

\*       \*       \*       \*       \*       \*       \*

" Special deputies, investigators, referees, witnesses and title searchers, services and expenses.. $60,000.00

" Before any liabilities are incurred against the above appropriation, a tentative segregation of the amount shall be approved by the governor. Changes in such tentative segregation may be made with his approval.

" Investigation of Sale of Securities and Unlawful Corporative Activities

" Services and expenses............... $210,000.00

" On or before June 15, 1929, the attorney-general shall file with the governor a tentative segregation of the amount hereby appropriated to be made available on July 1, 1929. Before any liabilities shall be incurred, such segregation shall have the approval of the governor and no change shall be made in this tentative segregation during the fiscal year commencing July 1, 1929, without his approval."

The State Finance Law, section 139, has since 1921 (L. 1921, ch. 336; L. 1927, ch. 364 [Cons. Laws, ch. 56]) provided as follows:

" § 139. Segregation of lump sum appropriations. When, by act of the legislature, a state department is created or reorganized, or state departments consolidated,

or a board, commission, division or bureau within a department is created or reorganized, and a lump sum is appropriated for its maintenance and operation, or for personal service, during the first fiscal year thereafter, no moneys so appropriated shall be available for payments for personal service, except temporary service or day labor, until a schedule of positions and salaries shall have been approved by the governor, the chairman of the finance committee of the senate and chairman of the ways and means committee of the assembly, and a certificate of such approval filed with the comptroller."

Although there is no accompanying act of the Legislature reorganizing the Department of Law or the Department of Labor, it is claimed by the respondent that this section is applicable to reorganization items in the budget bill or bills for such departments. Whether this contention is upheld or not, no question is raised as to the propriety of the reorganization items as such apart from the provisions for segregation.

In each instance in the original Governor's budget bill where a lump sum appropriation was specified for any purpose, the bill provided that the Governor should be the sole approving authority over segregations. Segregations consist of an itemized list of the positions and salaries covered by the lump sum appropriation.

The Legislature did not assent to the provision giving the Governor exclusive power of approval of such segregations. On February 27, 1929, it passed the Governor's original budget bill, striking out all the items to which the Governor had attached his provision of segregation control. The items were restated. Section 139 of the State Finance Law was allowed to take effect if and whenever applicable and in appropriations other than for reorganization of State departments the Legislature inserted segregation clauses calling for participation of the chairman of the legislative finance committees with the Governor in the approval of segregations.

The Governor refused to approve any of the lump sum items in which the chairmen of the finance committees were to share authority. He thereafter, on March 18, 1929, sent to the Legislature two supplemental budget bills, one containing many lump sum appropriations, for the needs of many State departments, all of which appropriations were restricted to the exercise of the Governor's sole power over segregations; and the other bill itemizing and segregating most of the appropriations appearing in lump sum form in the first supplemental bill. The Legislature, on March 28, 1929, acted upon this second supplemental bill, approving most of the segregated items therein, but again setting up a few of the departmental appropriations in lump sum form, more particularly the sums for reorganizing the Department of Law and the Department of Labor, with the intent that segregations were to be approved under section 139 of the State Finance Law. In cases other than reorganization, *i. e.*, in cases of the large lump sum construction items, the Legislature appended to them a segregation clause like the one in section 139, requiring in the same manner all three — the Governor, the Chairman of the Senate Finance Committee and the Chairman of the Assembly Ways and Means Committee — to approve segregations when any part of such moneys was to be used for *personal service*. The provision affecting the use of construction items for personal service is found in section 11 of the bill, as follows:

" § 11. No part of any appropriation made by this act for construction shall be expended for personal service except on the approval of the governor, the chairman of the senate finance committee and the chairman of the assembly ways and means committee. This provision may be complied with by the filing with the comptroller and the department of civil service of a list of the positions so approved and the time for which any person may be employed in such position. This provision, however,

shall not apply to personal service employed by a contractor, by an institution on construction work done under special fund estimate, by an interstate commission, or on highways."

On April 12, 1929, the Governor upon the return of the bill to him, approved the lump sum items for reorganizing the Department of Law and the Department of Labor, insisting, however, that section 139 of the State Finance Law was unconstitutional in its application to those items. He disapproved the general segregation clause, section 11, referred to above, applying to the segregation of personal service items in the large construction items, as he said, " on constitutional grounds." The bill became chapter 593 of the Laws of 1929. Other appropriation bills passed at the same session contain similar provisions and were acted on by the Governor in the same manner. As the questions raised thereunder are, with the exception hereafter indicated as to the State Office Site and Building Commission, identical with those stated above, no special reference need be made to them.

The controversy thus arising was submitted on an agreed statement of facts to the Appellate Division, Third Department, under Civil Practice Act, §§ 546–548, inclusive, and thus became an action brought by the Attorney-General in the name of the People of the State of New York to restrain the Comptroller from making payments without the approval of the legislative chairmen and it comes here on an appeal from a judgment in favor of the plaintiff. The appellant asserts that the Legislature had no constitutional power to assign to its chairmen the function of approvers of the segregation of lump sum appropriations. The respondent asserts that the Governor had no power to veto the segregation clause without vetoing the items to which it referred. Constitutional questions, fundamental in character and far-reaching in importance, calling for careful and thorough consideration by the court, thus present themselves.

Is section 139 of the State Finance Law unconstitutional? Is any other provision of law contained in the budget bills or elsewhere in the statute, allowing members of the Legislature to approve, with the Governor, segregations of lump sum appropriations in conflict with the fundamental law?

The first question to be considered is whether the Chairman of the Senate Finance Committee and the Chairman of the Assembly Ways and Means Committee may constitutionally be given the power to approve segregations of lump sums appropriated by the Legislature to the State departments. The power is given to them not as members of a Board, for there are no provisions for joint action, but as individuals, each of whom must exercise the power of approval independently. The question is primarily one addressed to the special limitations upon legislative power contained in the New York Constitution.

Long and interesting is the history of the struggle between the Executive and the Legislature for the control of the public moneys. It is, however, so well settled that the State Legislature is supreme in all matters of appropriations that the recital of the details of the strife for legislative supremacy would serve no useful purpose. The New York Constitution (Art. III, § 21) provides: " No money shall ever be paid out of the treasury of this state or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law." " The law-making power has the sole authority over the subject of taxation and the appropriation of money." (*Clark* v. *State*, 142 N. Y. 101, 104.) Equally interesting but superfluous would be the historical discussion of the division of powers between the executive, legislative and judicial departments. Such powers ought to be kept separate and they are kept separate by the New York Constitution (Art. III, § 1) which provides: " The legislative power of this state shall be vested in the senate and assembly," and article IV, section 1,

which provides: " The executive power shall be vested in a Governor." That the border lines of the three great departments of government are not definitely traced and that the division of such powers is not absolute is well understood. (*Matter of Richardson,* 247 N. Y. 401, 413.) It may be said in general terms that the Legislature makes laws and the Executive enforces them when made and each is, in the main, supreme within its own field of action, although common sense and the necessities of government do not require or permit a captious, doctrinaire and inelastic classification of governmental functions. (*Hampton & Co.* v. *United States,* 276 U. S. 394, 406.) The Legislature in making laws may, subject to the veto power of the Governor, create administrative offices and may provide how they shall be filled and nothing in the abstract division of powers prevents the selection of members of the Legislature to fill such offices. This power to create offices is legislative although the power of officers so appointed may be administrative. Their duties may be inconsistent with those of a member of the Legislature so that a choice must be made between them, under the rule which prohibits a person from holding two incompatible offices at one time, but in the absence of some constitutional or statutory inhibition a member of the Legislature is eligible to appointment to any office in the State or the civil divisions thereof. Prior to the adoption, in substance, in 1821 of the present article III, section 7, of the Constitution, it was the custom to appoint members of the Legislature to many of the great and valuable offices of the State. The practice had continued until the people expressed their disapproval, not so much of the merit and fitness of the appointees, as of the practice itself. In the debates in the Constitutional Convention of 1821 it was conceded that in point of talent and capacity a member of the Legislature might be better adapted to fill some executive or judicial office than any other person, but the method was condemned,

as subject to the danger of legislative subservience to the appointing power to obtain the spoils of office. (Lincoln's Constitutional History of New York, vol. IV, pp. 356 *et seq.*) It was thought wise to provide that the Legislature must be made independent, not only of the temptation to seek such appointments from the Executive, but also of the allurement to encroach upon the power of the Executive by appointing its own members to office. No one will question the fitness of members of the Legislature to hold administrative offices or to supervise the expenditure of public moneys, in the absence of a constitutional limitation. It is, however, quite elementary to say that the State Constitution is, subject only to the powers vested in the Federal government, the supreme law of the land; that the judges are bound thereby; that it is to be construed liberally and with regard to its fundamental aim and object and not with the acute verbal criticism to which a penal ordinance is properly subjected.

For upwards of one hundred years the Constitution has provided in substance as it now reads:

" Article III, § 7. No member of the Legislature shall receive any civil appointment within this State, or the Senate of the United States, from the Governor, the Governor and Senate, *or from the Legislature,* or from any city government, during the time for which he shall have been elected; and all such appointments and all votes given for any such member for any such office or appointment shall be void."

The words " any civil appointment " as thus used are very broad and include any placing in civil office or public trust, pertaining to the exercise of the powers and authority of the civil government of the State, not reasonably incidental to the performance of duties of a member of the Legislature, as distinguished from a military office or a mere employment or hiring on contract, express or implied. (*State ex rel. Barney* v. *Hawkins,* 79 Mont. 506; 53 A. L. R. 583, and notes.) The duties

of members of the Legislature may be enlarged without making a civil appointment or creating a new office, so long as the duties are such as may be properly attached to the legislative office (*Shoemaker* v. *United States*, 147 U. S. 282), but the importance of the office is immaterial if the appointment is administrative or judicial in character. The prohibition is absolute and unqualified and in analogous cases has been ruthlessly enforced.   It has been held that a park commissioner of a city is disqualified, under Constitution, article III, section 8 (*People ex rel. Sherwood* v. *State Board of Canvassers*, 129 N. Y. 360), which provides that no officer under a city government shall be eligible to the Legislature; and that the President of the Board of Aldermen of New York forfeited his office by accepting an appointment as a member of the Finger Lakes State Park Commission under a provision of the New York City Charter which provided that any city official who shall during his term of office accept " any other civil office of honor, trust or emolument " of the State shall be deemed to have vacated his city office. (*Matter of Hulbert*, 124 Misc. Rep. 273; affd., 213 App. Div. 865; 241 N. Y. 525.)   Under article VI, section 19, of the State Constitution, prohibiting a Supreme Court justice from holding any other public office or trust, it was held that a justice could not be assigned duties non-judicial in their character in aid of an executive investigation by the Governor under section 34 of the Public Officers Law (Cons. Laws, ch. 47), and could not accept such duties in his personal capacity.   (*Matter of Richardson, supra.*) Under these decisions, the chairmen of the two committees " discharge duties, not for his [their] own benefit, not for the benefit of private individuals, but for the public."   They are, therefore, public officers (*People ex rel. Sherwood* v. *State Board of Canvassers, supra*) and public officers vested with great powers to act as a check on the expenditure of lump sum appropriations.

Obviously the prohibition of the Constitution applies

equally when a member of the Legislature receives a civil appointment *ex officio*, as chairman of a committee and when he is appointed by name. Otherwise it would be possible, except for the recently amended article V of the Constitution, for the Legislature to provide, *e. g.*, that the Chairman of the Senate Finance Committee should be *ex officio* the State Superintendent of Banks, and to distribute offices to their own members by description rather than by name. No such evasion of the letter and spirit of the Constitution could be tolerated.

That the designation of the Chairman of the Senate Finance Committee and the Chairman of the Assembly Ways and Means Committee to approve the segregation of lump sum appropriations amounts to the making of civil appointments by the Legislature cannot be seriously disputed. The positions are created and filled by the Legislature; the incumbents possess governmental powers; the powers and duties of the positions are defined by the Legislature; such powers and duties are performed independently; the positions have some degree of permanency and continuity. Their power is not exhausted by a single act but is a general supervisory power over a large group of appropriations, amounting to nearly nine million dollars, to be exercised whenever the occasion arises. Unless the oath of a member of the Legislature is sufficient, the appointee should take the constitutional oath of office. (Const. Art. XIII, § 1.) Their appointment was on behalf of the government in a station of public trust not merely transient, occasional or incidental. It was " a continuing power to be exercised whenever occasion shall arise. * * * As often as the need arises, the call is to be met. * * * If the intention [of the legislature] was * * * to annex a permanent duty as an incident to the judicial [legislative] office, a public trust has been created though the occasions for discharging it may be irregular or fitful." (*Matter of Richard-*

*son, supra.*) If all this does not amount to a civil appointment, it is hard to see what more is required.

Respondent's counsel in their brief do not quarrel with this definition of a civil appointment. They say: " When acting on approvals the chairmen of the legislative committees are administrative officers, the same as the Governor is when performing that duty." Their contention is that such duties are reasonably incidental to the performance of the duties of a member of the Legislature. Doubtless many of the acts of members of the Legislature assigned in the past to boards, committees or commissions to investigate and report on matters of public interest in aid of the law-making power are reasonably incidental to the performance of legislative functions. Other duties assigned to such members by law may be of a private character, as when they are named as *ex officio* trustees of private educational establishments. (*Matter of McGraw,* 111 N. Y. 66, 112; *sub nom., Cornell University* v. *Fiske,* 136 U. S. 152, 200.) Others may be merely transitory or occasional and of minor import, not rising to the dignity of a civil appointment. The constitutional inhibition does not extend to such designations. (*Matter of Richardson, supra.*) Members of the Legislature may also be assigned to administrative duties by the Constitution, *e. g.,* as Commissioners of the Land Office, as they were in the Constitution of 1846–1926. But the duties here assigned to the legislative chairmen are administrative duties and are not mere incidents of legislation. The Legislature has not only made a law — *i. e.,* an appropriation — but has made two of its members *ex officio* its executive agents to carry out the law — *i. e.,* to act on the segregation of the appropriation. This is a clear and conspicuous instance of an attempt by the Legislature to confer administrative power upon two of its own members. It may not engraft executive duties upon a legislative office and thus usurp the executive power by indirection. (*Springer* v. *Philippine Islands,* 277 U. S. 189.)

Should the question arise whether the appointments under consideration are legislative or administrative, a dilemma presents itself, either side of which is fatal to the contention of the respondent. If they are legislative in character the appointment amounts to a delegation of the legislative power over appropriations. The Legislature cannot secure relief from its duties or responsibilities by a general delegation of legislative power to someone else. (*People* v. *Klinck Packing Co.*, 214 N. Y. 121.) The power to itemize legislative appropriations is a legislative power which it may exercise if it sees fit as long as the matter is in its hands. If the power to approve the segregation of lump sum appropriations may be delegated to any one, even to one or two members of the Legislature, it necessarily follows that the power to segregate such appropriations may also be conferred upon such delegates. The conclusion would then be inevitable that the Legislature could make lump sum appropriations and delegate the power to two of its members to segregate the same, not only within a department but among departments. To visualize an extreme case, one lump sum appropriation might be made to be segregated by the committee chairmen. Such a delegation of legislative power would be abhorrent to all our notions of legislation on the matter of appropriations. It would amount to a casting on others of a great measure of legislative responsibility assumed by the members themselves by their oath faithfully to discharge the duties of their office. If, on the other hand, the power is administrative, it has no real relation to legislative power. The head of the department does not legislate when he segregates a lump sum appropriation. The legislation is complete when the appropriation is made. The Legislature might make the segregation itself but it may not confer administrative powers upon its members without giving them, unconstitutionally, civil appointments to administrative offices. It might by general law confer

the power of segregation or approval of segregation upon any one but its own members, subject to the provisions of the Constitution (Art. V), hereinafter discussed, if applicable but the Constitution (Art. III, § 7, *supra*) makes its own members ineligible to such an appointment.

It follows that so much of the appropriation bills in question as confers powers on the legislative chairmen to approve segregations is unconstitutional and void. As the controversy clearly indicates that the legislative purpose would be thwarted by permitting the power of approval to remain in the Governor alone, all the provisions for the approval of segregations in section 139 of the State Finance Law must be held void. (*Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601, 635, 636.) So far as the appropriations themselves are concerned, they may be separated from the unconstitutional parts of the statutes and are, therefore, the law of the State. Both Legislature and Governor clearly intended that the departments should be properly maintained in any event and provided therefor. The Legislature may not attach void conditions to an appropriation bill. If it attempts to do so, the attempt and not the appropriation fails. (*Matter of Brennan* v. *Board of Education*, 250 N. Y. 570.) The State Finance Law, section 139, and the vetoed section 11 of chapter 593 of the Laws of 1929 and all similar segregation provisions in the appropriation bills of 1929 are, therefore, unconstitutional and void, although the appropriations themselves, with the exception hereinafter noted, are valid.

One such appropriation bill calls for special consideration. The legislative power appropriates money and, except as to legislative and judicial appropriations, the administrative or executive power spends the money appropriated. Members of the Legislature may not be appointed to spend the money. It follows that so much of the appropriations in chapter 93, Laws of 1929, for the erection of public buildings made to and to be

expended by the State Office Site and Building Commission, created by chapter 5, Laws of 1926, and composed of the Governor, as Chairman, the Temporary President of the Senate, the Speaker of the Assembly, the Chairman of the Senate Finance Committee, the Chairman of the Ways and Means Committee of the Assembly, the Superintendent of Public Works and the State Architect are affected with the vice of invalidity. A majority of the members of such Commission are legislative officers acting *ex officio* and are thus holding invalid civil appointments of an administrative character from the Legislature. When they are deprived of their offices or functions as members of such Commission, the Commission is eviscerated and invalidated, at least so far as its money-spending functions are concerned. (*Pollock* v. *Farmers' Loan & Trust Co., supra.*) Such items are $550,000 for the State Office Building at Buffalo, and $3,250,000 for the State Office Building in New York city.

On the question of practical construction, little need be said. Prior to the adoption of the amended article V of the Constitution many boards or commissions containing members of the Legislature *ex officio* were created but the practice of providing for the certification by members of the Legislature of payments from lump sum appropriations to the heads of administrative departments is one of recent but rapid growth. Since 1921 a department of the State government, practically permanent in its functions, has been created by the Legislature by conferring on its two chairmen functions of segregation and approval. Liberal appropriations are made for the expenses necessary in this connection. Other designations of members *ex officio* to act on boards and commissions have gone unchallenged. Good reasons suggest themselves for such inaction. Many such designations were free from criticism for the reasons hereinbefore stated, as being either private or truly special and temporary in character (*People ex rel. Washington* v. *Nichols,*

52 N. Y. 478) or in part *quasi* legislative. In others, the Speaker of the Assembly, or some other legislative officer, has been named *ex officio* as a minority member of a board composed largely of administrative officers, as was the case of the old Board of Trustees of Public Buildings. All questions of legislative eligibility in such instances have become stale with the lapse of time. The custom does not amount to a concession of power to the Legislature to control the expenditure of appropriations once and finally made, or to a practical construction of the Constitution in favor of the legislation here questioned. Now comes a serious conflict between the executive and administrative officers and the Legislature by reason of appointments amounting to a substantial encroachment by the latter upon the powers of the former. General acquiescence in a custom which, all things considered, may not have resulted in a harmful violation — or indeed, any violation — of the Constitution, does not preclude a contest when substantial rights are insisted upon. (*Los Angeles* v. *Los Angeles City Water Co.*, 177 U. S. 558, 579.) In times of peace and harmony constitutional rights are not asserted. When a crisis presents itself the Constitution is invoked and when a justiciable question is presented to the courts they must decide it.

Although the real question in controversy is thus disposed of, other points are urged by the appellant in support of his contention. Much of the argument has ranged itself about the budget provisions of the Constitution (Art. IV-A, § 3, adopted in November, 1927) which provide as follows:

" * * * The legislature may not alter an appropriation bill submitted by the governor except to strike out or reduce items therein, but it may add thereto items of appropriation provided that such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose;

none of the restrictions of this provision, however, shall apply to appropriations for the legislature or judiciary. Such a bill when passed by both houses shall be a law immediately without further action by the governor, except that appropriations for the legislature and judiciary and separate items added to the governor's bills by the legislature shall be subject to his approval as provided in section nine of article four."

The material part of article IV, section 9, which relates to the veto power of the Governor, provides: "All the provisions of this section, in relation to bills not approved by the Governor, shall apply in cases in which he shall withhold his approval from any item or items contained in a bill appropriating money."

The appellant contends that the explicit provisions of section 3, above quoted, were disregarded by the Legislature when it added section 11 to the Governor's supplemental budget bill; that the insertion of that section and like provisions in the Governor's budget bill altered the appropriation bill by adding to the items of appropriation a rider which was not an item or items of appropriation but was a piece of independent directory legislation. As we have already held that section 11 and similar provisions are void for unconstitutionality, the specific question is at present largely academic. If it were necessarily before us, an additional reason would appear for reversing the judgment below so far as it is affected by such provisions.

The respondent's counsel rely on section 22 of article III of the Constitution, which provides: "No provision or enactment shall be embraced in the annual appropriation or supply bill, unless it relates specifically to some particular appropriation in the bill; and any such provision or enactment shall be limited in its operation to such appropriation," and was inserted in the Constitution of 1894 to prevent the inclusion of general legislation in an appropriation bill. They contend that

because the provision or enactment inserted in the bill by section 11 was germane to the particular appropriations in the bill to which it applied and was limited in its operation to such appropriations, it was, therefore, in accordance with the Constitution. But the provision of section 22, article III, which is prohibitory in terms, has no affirmative application to " an appropriation bill submitted by the governor " so as to permit the addition of the rider in question. The converse of the proposition stated negatively in section 22 is not true as applied to such bill. The rider is an alteration of such bill other than by striking out or reducing items therein; it is not an addition of an item of appropriations stated separately and distinctly from the original items of the bill and referring to a single object or purpose and its insertion in the bill was improper.

The provision for a budget system is a new and complete article of the Constitution to be read in connection with all other provisions contained therein as the latest expression of the popular will. While it in no way limits the ultimate powers of the Legislature to make appropriations (Art. IV-A, § 4) it regulates the executive and legislative machinery and defines the method whereby appropriations shall be made. Its provisions were disregarded by the Legislature when it inserted section 11, regulating the segregation of appropriations generally. Nothing, however, contained therein prevents the Legislature from itemizing appropriations or from enacting general laws, apart from the Governor's budget bill, providing how lump sum items of appropriation shall be segregated, subject to the veto power of the Governor and the constitutional limitation of the Constitution, article III, section 7, heretofore discussed, and the provisions of article V of the Constitution so far as applicable. Assuming, however, that section 11 was a proper item for the Legislature to insert in a budget appropriation bill, much force attaches to the contention that such a

direction is one which the Governor might veto. It is an item or particular, distinct from the other items of the bill, although not an item of appropriation. (*Fairfield* v. *Foster*, 25 Ariz. 146; *Wood* v. *Riley*, 192 Cal. 293.) The veto power may not be circumvented by any such device of the Legislature.

A fundamental question presents itself in this connection. If the Legislature may not add segregation provisions to a budget bill proposed by the Governor without altering the appropriation bill, contrary to the provisions of article IV-A, section 3, it would necessarily follow that the Governor ought not to insert such provisions in his bill. He may not insist that the Legislature accept his propositions in regard to segregations without amendment, while denying to it the power to alter them. The alternative would be the striking out the items of appropriation thus qualified *in toto* and a possible deadlock over details on a political question outside the field of judicial review. The whole business of segregation seems to be a matter foreign to the budget appropriation bills, tending to prevent necessary appropriations for the support of government whenever the Governor and the Legislature are not in accord as to the manner in which lump sum appropriations should be segregated.

Another constitutional provision is brought to our attention. The amended article V of the Constitution provides (§ 2) for twenty civil departments in the State government, not including the legislative and the judiciary. It reads as follows: " There shall be the following civil departments in the State Government: First, Executive; second, Audit and Control; third, Taxation and Finance; fourth, Law; fifth, State; sixth, Public Works; seventh, Architecture; eighth, Conservation; ninth, Agriculture and Markets; tenth, Labor; eleventh, Education; twelfth, Health; thirteenth, Mental Hygiene; fourteenth, Charities; fifteenth, Correction; sixteenth, Public Service; seventeenth, Banking; eighteenth, Insurance; nineteenth,

Civil Service; twentieth, Military and Naval Affairs."
The number of departments was reduced to eighteen by
chapter 343, Laws of 1926, effective January 1, 1927.
Section 3 requires the Legislature to " provide by law
for the appropriate assignment  *  *  *  of *all* the civil,
administrative and executive functions of the State Govern-
ment, to the several departments in this article provided."
The purpose of the amendment was greatly to reduce the
number of State departments and boards and to confine
the distribution of all civil administrative functions, not
temporary and special, to the departments enumerated
in the Constitution (Art. V, § 2, *supra*) and to vest the
appointment of department heads, so far as may be,
in the Governor.  (Art. V, § 4.)  The duty of reorgani-
zation thus imposed was performed by the Legislature of
1926, by laws effective on January 1, 1927.  The dis-
tribution of administrative functions to members of the
Legislature, rather than to the constitutionally created
civil departments, is thereby prohibited.  The Legislature
may create no departments or boards other than those
named in the article, except as section 3 provides that it
may create " temporary commissions for special purposes."
The legislation here questioned distributes administrative
functions of an important and general nature in a manner
not provided for by the Constitution.  The legislative
policy as indicated is to renew this distribution of powers
from year to year so that the attribute of general per-
manency attaches thereto.  Although, under our ruling
that section 11 is void, it is not necessary for the decision
to pass definitely upon this question, it is clear that
administrative functions other than those temporary in
their character and special in their purpose, may be
constitutionally bestowed only upon one of the civil
departments of the State government provided for in
article V, section 2.

In this connection it appears that the duties of the
State Office Site and Building Commission were in effect

taken from the Department of Public Works or other constitutional departments of government under the legislative ruling that it was *a temporary commission for a special purpose*. It is questionable whether a part of the duties of a constitutional department may thus be taken from it and assigned to a special commission. (L. 1926, ch. 348.) The whole body of departmental duty is continuous and if the parts may be separated into the temporary and special acts which go to make up the whole, all the powers of a constitutionally created administrative department may be shorn from it and distributed to temporary commissions to be renewed from year to year and the basic purpose of the amendment thus set at naught. At least it may be safely said that the provisions of article V could be completely nullified if the Legislature might withdraw from the departments thereby created the functions assigned to them by law and confer them upon its own members.

The result of our decision is that it devolves upon the heads of the departments to which the lump sum appropriations of 1929 drawn in question in this action were made, excepting the appropriations for the State Office Site and Building Commission, to apportion and allot the funds under such appropriations in accordance with law, without the approval of the Governor or the legislative chairmen.

The judgment should be reversed and judgment directed in accordance with this opinion, without costs.

CRANE, J. (concurring for different reasons). The power of the Legislature over appropriations is plenary unless restricted by the State Constitution. It may not delegate its powers to make appropriations. It may not make a lump sum appropriation for the public needs and authorize one of its members to divide it up as necessity requires. This is simply making an appropriation; acting for the Legislature; a delegation of its

powers to the individual. No one questions this. In such an instance it would be equally a delegation of power if the authority were given to a member of the Legislature or to one not a member of that body, an administrative officer. It is conceded by all in this case that segregation by an administrative officer of a lump sum appropriation made for his department, is not a delegation of legislative power. The Legislature makes an appropriation but may permit segregation, that is, the dividing it up among the positions by someone else. We may, therefore, dismiss this question of delegation of power as it is not in the case.

So too we may dismiss the question of the power of the Legislature to make its own segregation. It is conceded on all sides that the Legislature is not compelled to make a lump sum appropriation; in fact, the spirit and apparent intention of the budget amendment to the Constitution is that there shall be itemized appropriations. The best thing to do is to put the purpose in the appropriation and limit the expenditure to the amount of the appropriation for each item. The Governor and Legislature have apparently done this for the major part of the budget bill.

But it is also conceded that there are times when item appropriations would be almost impossible or impracticable, as in the case of the reorganization of an office, and lump sum appropriations are made. It is because of such instances that the Legislature and the Governor came to an impasse in 1929. May the Legislature, in making a lump sum appropriation, authorize, even with the consent of the Governor, that the lump sum appropriation shall be segregated by the Governor and a member of the Legislature? The appellants concede that it may be done by the Governor alone as segregation is not a delegation of legislative power. They say, however, that it may not be done with the aid of a member of the Legislature as this violates article III, section 7, of the

Constitution, which reads: "No member of the Legislature shall receive any civil appointment within this State, or the Senate of the United States, from the Governor, the Governor and Senate, or from the Legislature, or from any city government, during the time for which he shall have been elected; and all such appointments and all votes given for any such member for any such office or appointment shall be void."

If the Legislature may not authorize one of its members to aid in segregation because violative of this provision of the Constitution, it, of course, could not do so, even with the consent of the Governor. Any bills so providing approved by him, would be illegal.

I do not concur in the opinion that a legislator so acting has taken an office or appointment within the prohibition above quoted. The member of the Legislature has not accepted another office, for he is not obliged to take a constitutional oath other than that which he had taken as a member of the Legislature. There is no permanency to such work. The appropriations are made only for one year. The reorganization of an office is supposed to take place as soon as the administrative incumbent takes office and segregation, therefore, is supposed to be a matter of immediate concern. When segregation is once made it is over with. The question of dividing the money appropriated among the various places to be created by the head of the department is a temporary act, an act incidental to the making of the appropriation, a mere detail of carrying out and effectuating the appropriation made. This work is a further step in applying an appropriation to the situation. It is temporary, incidental, and has none of the elements which go to make up an office or an appointment to an office, or, if we prefer, an appointment to a place of public trust. Assuming that the word "appointment" means something more than an appointment to an office, that is, that it means an appointment to a place of public

trust, the cases have repeatedly held, and so have we recently, that an office or an appointment to a place of public trust means something of a permanent nature, something that has annexed to it a permanent duty; something not merely transient, occasional or incidental. A mere temporary exercise of power is not an office or an appointment. (*Matter of Richardson*, 247 N. Y. 401, and cases cited.) This duty of approving the segregation of certain sums given by the Legislature is a temporary duty and does not rise to the dignity of a place or an office. Personally I am of the opinion that article III, section 7, applies to an office; the Legislature cannot take any other office. The word "appointment" is synonymous with office. In Lincoln's Constitutional History of New York, volume 4, page 358, the author says: "The power prohibited by the section is political, and relates only to qualifications for office." (See *Stewart* v. *Mayor*, 15 App. Div. 548.)

I do not agree with the suggestion or statement in the opinion that the word "appointment" in this section of the Constitution has the same meaning as the words "public trust" in section 19 of article VI of that document. This latter provision reads: "The judges of the Court of Appeals and the justices of the Supreme Court shall not hold any other public office or trust." Place alongside these words those of section 7 of article III, "no member of the Legislature shall receive any civil appointment within this State," it is clear to see that "civil appointment" means less, much less, than "public trust." An appointment is a designation to an office; there may be a public trust or duty not amounting to an office. (See *Matter of Richardson, supra.*) The reason for the difference is apparent. A judge shall take no other public trust because he has sufficient to do to serve as a judge. His duties should be confined to his judicial work — he should be single minded. The provision regarding the Legislature was to prevent that body from creating

offices and filling them with its own members as had theretofore been the practice. (See Lincoln's Constitutional History, *supra*.)

I, therefore, cannot follow the determination upon this point. For over a century this has been the view of the law as the Constitution of 1821 contained a similar restriction. Nor can I appreciate the distinction drawn between public trust or appointment and a private trust or appointment. I do not know how the Legislature can appoint a member to a private trust. Appropriations are made by the State to Cornell University and to the University of Syracuse. On the board of said institutions are members of the Legislature by virtue of chapter 585, Laws of 1865, and chapter 339, Laws of 1913 — the object being no doubt to watch the expenditure of public moneys. How is this a private trust? When the member of the board is thus designated by law, it is a public trust, or else the Legislature has no power to deal with it. It is a private trust for those not sitting by designation under some specific law. The Legislature cannot give away public moneys. (Article VII, section 1, Constitution of New York; *People* v. *Westchester County National Bank*, 231 N. Y. 465.) The legislators sit on these boards spending the public money because the duties are incidental to the appropriations and the duties of the Legislature. (Const. art. VIII, § 9.)

I agree, however, to the conclusion reached by my associate but upon a different ground, which briefly is that when a member of the Legislature is clothed with the duty of segregating lump sum appropriations he ceases to act as a legislator and is performing executive duties, administrative functions which under our form of government is illegal. The importance of maintaining the independence of the three departments of our republican form of government has often been stated and, as occasion arose, enforced by the courts. The only instances that I know of in which the duties of the

executive, legislative or judicial branches of the government have overlapped or merged imperceptibly into the field or domain of the other is when the work or duty assumed has been of necessity and almost by common consent incidental to and part of the duties cast upon the particular department of government. The Legislature makes investigations, summons witnesses and holds hearings, acts at times like a court for the purpose of enabling it to form legislation for the future. The Judiciary makes rulings which have the form and force of statutory laws and enactments; makes appointments to office, duties which border upon the legislative. And the Executive makes rulings and decisions, at times executive orders, and in some cases holds hearings, with power of investigation which somewhat encroaches upon the field of the Legislature and the Judiciary.

In *Springer* v. *Philippine Islands* (277 U. S. 189) Mr. Justice HOLMES, in his dissent, was of the opinion that we could not divide our branches of government into watertight compartments. I am sure nobody disagrees with him and yet the principle still remains and was enunciated in that case that the Legislature cannot become an administrative body or, through its members or committees, perform the work of the Executive or the Judiciary. There is a time when the duties must be kept separate and apart in order that our form of government may be preserved. The doubtful cases make the trouble; the small beginnings and encroachments create the danger. Everyone becomes alarmed at open usurpation and we need fear no such occasion. Rather should we be alive to the imperceptible but gradual increase in the assumption of power properly belonging to another department. Such is this case. The principles are fully set forth and explained in such cases as *Springer* v. *Philippine Islands* (*supra*); *Kilbourn* v. *Thompson* (103 U. S. 168); *Hampton & Co.* v. *United States* (276 U. S. 394); *Matter of Davies* (168 N. Y. 89) and *Matter of*

*Richardson* (*supra*) and it remains merely for us to apply them here. The questions are determined by common sense and the inherent necessity of governmental co-ordination. (*Hampton & Co.* v. *United States, supra.*)

In my judgment, the Legislature has attempted to place the administrative work of supervising an administrative office upon a member of the Legislature, giving to him powers which he was not elected to assume. That the Legislature is supreme in the matter of making appropriations and controlling the revenue is a fundamental of government. This control no one challenges. The question is whether, after having made an appropriation, having authorized an expenditure, the Legislature can follow it up and through a committee or a single member aid or control the manner in which the appropriation shall be disbursed. In the instances before us the Legislature has appropriated millions of dollars and yet restricted its expenditures to an approval by two of its members. This approval must be obtained before the lump sum appropriation is segregated, which means, of course, that these legislators have a control and a power over the administrative office or officer to whom the appropriation or for whom the appropriation has been made. These legislators must be consulted and their consent obtained as to the number of employees or the amount of expenditure for supplies or other matters that may be requisite for the doing of the work. The legislator thereupon in reality becomes a part of the administrative office; he functions as an administrator responsible for the due performance of the work. Performance of administrative work depends upon help. The kind and nature of the help, or, in other words, the efficiency required for the performance of the work, rests with the approval or disapproval of these members of the Legislature.

The power is immense and in its full exercise may be so arbitrary as to make the Legislature, through its

committees or its single member, control every executive department. In reading what I say care should be taken to note that this carries no reflection whatever upon the members of the Legislature who, beyond doubt, have heretofore exercised this power of segregation with care, with wisdom, with desire for the public weal, and without any abuse. In fact there is no suggestion in the briefs of learned counsel for the appellant that the Legislature has exercised this power of segregation for any selfish purposes. We are dealing, however, with a question of power, with the thing which may be done in the hands of arbitrary men. It seems too plain for words that such control, softly phrased by the word " approval," carries with it the power to run the office.

We need not draw upon our imagination, rather turn to recollection. The past is only valuable for the lessons which it teaches. All of us know from experience that he who has control of the spending of the money, when the money is there to spend, exercises real power for good or for ill.

Personally I can see no escape from the position that the Legislature has absolute control over appropriations. It may make appropriations also upon such conditions and with such restrictions as it pleases. It can create or limit the power of administrative offices. There is one thing, however, it cannot do and that is implied, if not expressed in our Constitution. It cannot exercise the functions of the Executive. It cannot administer the money after it has been once appropriated. If it makes lump sum appropriations, whatever conditions it may attach to its expenditure, it cannot make one of those conditions the approval by one of its own members; that is, to confer upon him the duties of an administrative office. Therefore, while I differ with my learned brother as to his reasons, I arrive at the same conclusion. The duty of the approval to segregation of the various sums appropriated required by the Legislature is not the

appointment to an office within the prohibition of section 7 of article III of the Constitution. It is, however, equally illegal by attempting to clothe members of the Legislature with administrative functions after an appropriation has been made.

There are also other reasons for reversing the judgment below in its principal features. In adopting the amendment to the Constitution now known as the executive budget, it appears to me that there was an attempt made in article IV-A of the State Constitution to provide a new method, given in much detail, for the making of appropriations for the various departments of government. Whatever may have been done before, new methods were to be pursued upon the adoption of this amendment; laws in force at the time fell by the way — the Constitution was to override all of the laws and start with a clean sheet. Thus we find that the head of each department of State government, except the Legislature and the Judiciary, shall submit to the Governor itemized estimates of appropriations to meet the financial needs of such department, including a statement in detail of all moneys for which any general or special appropriation is desired from the Legislature. These shall be classified according to relative importance, and in such form as to give all the information the Governor may require. Copies of these estimates should be simultaneously furnished to the designated representatives of the appropriate committees of the Legislature for their information. On these proposed estimates, the Governor is to have a hearing, to which he shall invite the committees of the Legislature to attend. These representatives of the Legislature shall be entitled to make inquiry in respect to the estimates and the revision thereof. Up to this point, therefore, what do we have ? The needs of the various departments are thoroughly examined into by the Governor and by the Legislature so that when the budget goes to the Legislature, no further inquiry need be made. All information

will have been obtained that is necessary, if the committees appointed to investigate do their work thoroughly. This is the purpose and object to be accomplished by this provision of the Constitution. (Report of Reorganization Commission, February 26, 1926.) After all this information has been acquired, sifted, details gone into, the Governor makes up his budget, which will contain a complete plan of proposed expenditures and estimated revenues; " it shall contain all the estimates so revised or certified and clearly itemized, and shall be accompanied by a bill or bills for all proposed appropriations and reappropriations." (Art. IV-A, § 2.) When the Legislature gets this bill what can it do with it? The Constitution is very specific. It supposes, as I have said, that the appropriation bill contains items, not lump sums, and that the items of appropriation follow the items of the budget as submitted. The Constitution then provides what the Legislature may do with this budget bill. The Legislature may require the heads of the departments to appear and be heard in respect to the proposed budget and then the Legislature " may not alter an appropriation bill submitted by the Governor except to strike out or reduce items therein, but it may add thereto items of appropriation provided that such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose." (Art. IV-A, § 3.) The Legislature, therefore, to repeat these words, may strike out an item. The appropriation bill is to be made up of items. Estimates of appropriation, referred to in section 1 of article IV-A, are to be itemized; the budget bill is supposed to be itemized. The Legislature may reduce an item, which means, of course, reduce the amount requested. It may also add items of appropriation which means providing money for a certain purpose; the purpose is to be stated separately and distinctly from the original items of the bill, each item referring to a single object or purpose. The whole scheme, therefore, as it appears to

me, is this — the proposed appropriation in the budget bill shall be itemized, which means a certain amount of money shall be asked for certain places or certain purposes. The Legislature may strike out an item, it may reduce an item, or it may make another item appropriation, that is, give money for a certain specified purpose, the money appropriation being for one purpose or one item only. There is no limit as to the number of these items of appropriation which the Legislature may propose to the Governor, but they must be items of appropriation, each item specifying the object or purpose for which the money is provided. So important was this new method adopted by this constitutional amendment, that if the Legislature passed the budget bill as proposed by the Governor, it did not have to be submitted to him for his approval; it became a law upon passing the Legislature. The idea was that all difficulties and disagreements would be ironed out in the preliminary hearings before the Governor and the Legislature committeemen. Separate items, however, added to the Governor's bill by the Legislature, in the manner indicated by me, had to be submitted in the usual form for his approval.

Certain things seem quite clear to me, and one is that in view of this constitutional amendment, section 139 of the State Finance Law had no further application to the budget bill. It did not touch and could not affect the appropriation thus made. If, for the purpose of reorganizing a department, certain lump sum appropriations were made instead of item appropriations, the segregation was to be made by the department receiving the appropriation and not by the method provided in section 139 of the State Finance Law. The budget bill as passed was to be and must be complete in itself, without reference to any other law.

The lump sum appropriations, therefore, for the Department of Law, passed by the Legislature and approved by the Governor April 12, 1929, have full force

and effect as appropriations for that department, to which section 139 of the State Finance Law has no application. The head of the department is to segregate the amount of the appropriation in accordance with his reorganization plans and requirements.

The appropriation for the Department of Labor of the lump sum of $2,700,000, approved by the Governor April 12, 1929, stands by itself. This sum is to be segregated by the head of that department. Section 139 of the State Finance Law has no application. In so far as the Governor stated in his approval of the appropriations that section 139 was not applicable he was correct.

Various items of appropriation were made for the construction of State works and buildings. The Legislature struck out the items and resubmitted the same items of appropriation, adding, however, a section known as section 11, reading as follows:

" § 11. No part of any appropriation made by this act for construction shall be expended for personal service except on the approval of the governor, the chairman of the senate finance committee and the chairman of the assembly ways and means committee. This provision may be complied with by the filing with the comptroller and the department of civil service of a list of the positions so approved and the time for which any person may be employed in such position. This provision, however, shall not apply to personal service employed by a contractor, by an institution on construction work done under special fund estimate, by an interstate commission, or on highways."

These appropriations stand as passed by the Legislature, approved by the Governor, but section 11 has no force or effect whatever; it is not an item of appropriation within the meaning of the Constitution as above explained. If anything, it is an attempted alteration, which is void, according to the terms of that instrument.

The item of $17,800 in the supplemental budget of

the Department of Public Works for expert and temporary service falls because the item, as submitted by the Legislature with its segregation clause, was vetoed by the Governor. The same applies to the item of $100,000 for furnishings and equipment for the new State building, because this also was an item submitted and vetoed by the Governor.

The Laws of 1929, chapter 93, authorizing the creation of a State debt and making an appropriation for the construction of State buildings and the items thereof providing for the issuance of State bonds, all to be expended under the direction of the Office Site and Building Commission, as created by the Laws of 1926, chapter 5, and authorizing the transfer of funds, is more than a provision for incidental and temporary duties. Chapter 5 of the Laws of 1926 creates a Commission to consist of the Governor, Superintendent of Public Works, State Architect, Temporary President of the Senate, the Speaker of the Assembly, the Chairman of the Senate Finance Committee and the Chairman of the Ways and Means Committee of the Assembly. The Commission is to be known as the State Office Site and Building Commission. The act provides for the construction, through this Commission, of an office building in Albany. A member of the Legislature serving on such a Commission has never been deemed, in the history of the State, to hold an office or appointment separate and distinct from that of a legislator. His duties on such a Commission are temporary and incidental to the work of the Legislature. Such duties do not rise to the level of an office or an appointment within the meaning of section 7 of article III of the State Constitution. This present Commission, however, as supplemented by chapter 93 of the Laws of 1929, covers more than one object and appears to be one of a permanent nature, extending its powers over many cities and the erection of public buildings therein. The authorization contained in section 14 of chapter 93 of the Laws of 1929 is so broad and extensive as, in my

judgment, to bring it within the classification of an appointment within the meaning of the Constitution as heretofore defined and explained.

The point, however, to be applied is this, appropriations made by the Legislature in lump sums are to be segregated by the heads of the departments. Section 139 of the State Finance Law does not apply. The other item appropriation bills stand as legal appropriations, section 11 attached thereto being void. The new items submitted to the Governor, which were in fact new items, referring to but one appropriation and giving but one amount, vetoed by the Governor in part, were vetoed *in toto* The Governor cannot veto part of an item.

I am for reversal but upon the grounds I have above stated.

CARDOZO, Ch. J., LEHMAN, KELLOGG, O'BRIEN and HUBBS, JJ., concur with POUND, J.; CRANE, J., concurs in result in separate opinion.

Judgment reversed, etc.