REXFORD G. TUGWELL, GOVERNOR OF PUERTO RICO, ET AL., Petitioner, *v.* DISTRICT COURT OF SAN JUAN, Respondent.

No. 20. Argued October 9, 1944.—Decided December 5, 1944.

*Jesús A. González,* Acting Attorney General, *E. Campos del Toro, Miguel Guerra-Mondragón,* and *Arcilio Alvarado,* for petitioners. *F. Fernández Cuyar, Héctor González Blanes,* and *Luis A. Archilla Laugier,* for intervener, plaintiff in the main action.

Mr. Justice Snyder delivered the opinion of the court.

The Insular Emergency Fund is a permanent, continuing appropriation "of the cash balance of the general fund . . . exceeding the balances of the appropriations provided for in the budget . . ." at the close of each fiscal year. Section 3, Act No. 33 of 1932.[1] The Fund, thus constantly replenished and augmented, consisted, as of June 30, 1944, of $8,155,579.20. Section 4 of Act No. 33 provides that the "Insular Emergency Fund shall be applied to meet . . . unforeseen public needs caused by calamities, such as wars, hurricanes, earthquakes and plagues. . ." Section 7 provides

[1] Laws of Puerto Rico, 1932, as amended by Act No. 3, Laws of Puerto Rico, 1942, Third Special Session.

that "Disbursements from the Insular Emergency Fund shall be made only pursuant to a resolution adopted by the affirmative vote of four members of a committee made up of the following five members: the Governor, the Speaker of the House of Representatives, the President of the Senate, the Treasurer and the Auditor of Porto Rico."

On May 17, 1944 the Commissioner of the Interior requested a grant of $100,000 from the said committee "to meet the unexpected public needs caused by the continuous drought suffered by the Island . . . through the development of a program of public works. . ." On the same date the Acting Commissioner of Agriculture and Commerce made a similar request. He pointed out that the sugar cane, coffee and cotton crops had been considerably damaged, and emphasized the serious situation with reference to subsistence crops as a result of the drought. He therefore asked for $400,000 to provide employment and to buy seed and fertilizer for needy farmers. On May 22 the Committee met and by a four to one vote passed a resolution approving the said petitions and allocating the sums requested. The dissenting vote was cast by the Speaker of the House.

On June 19 Rodríguez Pacheco, as a taxpayer and as Speaker,[2] filed a petition in the district court against the remaining members of the committee and others praying for a declaratory judgment that Act No. 33 was unconstitutional and invalid, and that the resolution of May 22 of the committee was null and void.[3] On June 28 Rodríguez Pacheco, reciting that the funds allocated by the said resolution were being rapidly spent and would soon be exhausted, prayed for

[2] We find it unnecessary to examine the contention that Rodríguez Pacheco has no standing to pursue the remedy invoked herein as Speaker and as a member of the committee (see *Gov't. of the Capital* v. *Exec. Council*, 63 P.R.R. 417), in view of his right to sue as a taxpayer. *Buscaglia* v. *District Court*, 64 P.R.R. 11, decided July 28, 1944, affirmed by the Circuit Court of Appeals on October 24, 1944. The writer stands alone in dissenting from the views of this court on this point, and is of course bound by the opinion of the court thereon.

[3] An amended petition was filed on July 7, making additional contentions.

a restraining order and an injunction *pendente lite*. This was amended on June 29, and on the same date a restraining order and an order to show cause why an injunction *pendente lite* should not be granted were entered. On June 30 the defendants moved to dismiss, and on July 24 they filed answers to both the petitions for a declaratory judgment and for an injunction *pendente lite*. On July 24 and 31 a hearing was held on the petition for an injunction *pendente lite*, at which testimony was adduced by both parties. The testimony showed that of the funds allocated by the committee to the Interior and Agriculture Departments, $15,905.94 and $205,545.40, respectively, remained unexpended.

On August 25 the district judge filed a careful and comprehensive opinion holding that Act No. 33 was invalid and that the action taken thereunder was void. We granted certiorari, pursuant to Act No. 32 of 1943, to review the order of the district court of the same date granting a preliminary injunction restraining the further expenditure of the funds in question.

The members of the committee contend initially that the lower court erred in passing on the validity of Act No. 33 at this stage of the proceeding. Their position is that the district court should have confined itself, on a motion for a preliminary injunction, to determining whether a serious and substantial question was involved. In support of this argument they cite *Rivera* v. *Tugwell, Governor,* 59 P.R.R. 834; 60 P.R.R. 80. We are at a loss to understand the theory on which the committee presses this point. As the discussion herein will disclose, it cannot be gainsaid that this case involves serious and substantial questions of law. To apply *Rivera* v. *Tugwell* would therefore probably require us without further ado to uphold the action of the district court in granting a preliminary injunction.[4]

[4] This is so if we assume that the balance of convenience is in favor of Rodríguez Pacheco.

But we are not prepared to say, under all the circumstances of this case, that the district court was not warranted in making a determination of constitutionality herein. An answer was filed, testimony was taken, and the case submitted on briefs. There was no substantial controversy as to the facts. It is therefore difficult to see how further testimony and argument could have aided the lower court. Moreover, it was a matter of grave public interest that the issues raised by this case be decided promptly. We perhaps would not have criticized the lower court if it had stopped short of a final determination, and had reserved that question for the hearing on the petition for a permanent injunction. But the district court apparently felt that no useful purpose would be served by such a postponement, and we cannot disagree with that conclusion. The committee has made no showing that it specifically asked for such a restrictive ruling in the lower court. And, as already noted, if we now agreed with the committee, it would almost inevitably require us to let the injunction stand, since a serious and substantial question is obviously involved. Indeed, the case on which the committee relies, *Rivera* v. *Tugwell,* held that a preliminary injunction was required.

This case, after all, went off on a pure question of law, which no amount of testimony could change. The order granting the preliminary injunction was appealable.[5] And the case has been brought here under Act No. 32, which was passed to enable "prompt settlement of the question presented for review" and which gives us considerable scope, even to the extent of entering what is in substance a final judgment when reviewing under certain circumstances a mere restraining order (*Buscaglia* v. *District Court, supra*). Without laying down any general rule which purports to cover other cases, we therefore conclude that the lower court was entitled in this case to render its opinion as to the va-

---

[5] *Rivera* v. *Tugwell, supra; Fernández* v. *Buscaglia, Treas.*, 60 P.R.R. 582.

lidity of Act No. 33 and action taken thereunder in considering the motion for a preliminary injunction.

 We pass to the merits of the case. Here we find a considerable area of agreement between the parties. The committee concedes that the district court was correct in holding that it was a violation of the separation of powers and an unconstitutional invasion by the Legislature of executive functions to provide in § 7 of Act No. 33 that the Speaker and the President of the Senate shall be members of the committee which must approve all disbursements from the Insular Emergency Fund. *Springer* v. *Philippine Islands*, 277 U. S. 189.[6]

But the next question is somewhat more difficult. Does the admitted invalidity of the portion of § 7 providing for representation of the Legislature on the committee require the courts to strike down Act No. 33 in its entirety? Here again the parties and the lower court are in agreement as to the relevant rule of law. The dispute arises, as is often the case, from the attempt to apply the rule to the facts herein. The rule of law is delusively simple to state. But as usual the standard semantic symbol of the law on which there is unanimous agreement in framing the rule evoke violent disagreement when a particular case must be decided

---

[6] We note in passing that the district court felt that its conclusion was reinforced by the provision of § 30 of our Organic Act that ''No senator or representative. . . shall, during his term of office, be appointed to any civil office under the Government of Puerto Rico. . .'' (Title 48 U.S.C.A. § 819). There is undoubtedly considerable force in this argument. The same philosophy of government which gave rise to the broad rule of the *Springer* case is specifically and concretely expressed in the inhibition placed on members of the Legislature by § 30. While the cases cited and the reasoning of the lower court appear to be sound, the broad doctrine of the *Springer* case, standing alone, is sufficient to bar the Speaker and the President of the Senate from membership on the committee. As this is conceded by the committee, it is unnecesary to give a final answer as to § 30.

We also add that we are in agreement with the holding of the lower court, which is not challenged here by Rodríguez Pacheco, that § 7 does not represent an improper delegation of legislative power. As the district court points out, the standards set up by the statute are a sufficient guide for the executive function of disbursement.

by application of the formula. In any event, we begin by stating the rules on how to determine if a statute—admittedly invalid in part—is wholly invalid, or is only partially invalid.

The test is two-fold: (1) the Act must be capable of separation in fact; and (2) the Legislature must have intended that the Act be separable. Stern, Separability and Separability Clauses in the Supreme Court, 51 Harv. L. Rev. 76, states the rule as follows: ". . . the Supreme Court, the state courts, and secondary authorities all appear to agree that the invalidity of part of a law . . . will not affect the remainder (1) if the valid provisions . . . are capable of being given legal effect standing alone, and (2) if the Legislature would have intended them to stand with the invalid provisions stricken out." See *Dorchy* v. *Kansas*, 264 U. S. 286, 289–90.

The first problem does not merit serious consideration. The taxpayer does not contend here, nor did the district court find, that the Act was wholly invalid because elision of the invalid phrases would make the Act unworkable. Indeed, the cases hold that it is proper to excise invalid individual words or phrases from a section of a statute if this results in leaving the section and the remainder of the statute workable.[7] And § 7 of Act No. 33 easily passes this test. That Section, with the offensive provision elided, reads as follows: "Disbursements from the Insular Emergency Fund shall be made only pursuant to a resolution adopted by . . . a committee made up of the following . . . members: the Governor . . . the Treasurer and the Auditor of Porto Rico."[8] We therefore proceed to determine if the

---

[7] *People ex rel. Alpha Portland Cement Co.* v. *Knapp*, (N.Y. 1920) 129 N.E. 202, 7; *Berea College* v. *Kentucky*, 211 U.S. 45; *New York Central R. R.* v. *United States*, 212 U.S. 481; *El Paso & Northeastern Ry.* v. *Gutiérrez*, 215 U.S. 87; *Stern, supra*, p. 110.

[8] It should be noted, for reasons to be hereinafter given, that we have elided the four-vote provision on the theory that it also falls with the legislative members provision.

Legislature would have intended for the statute, as thus pared down, to remain in effect.

But before approaching the present case, we must bear in mind certain preliminary considerations. Both parties and the lower court rely on the same cases. Nevertheless, "The law that has grown up about this branch of statutory construction is not susceptible of clear-cut rationalization, despite its frequent use and ramification. Separability cases are decided in the light of established principles, but each decision rests largely upon its own particular facts."[9]

Also, candor compels recognition that in such cases ". . . what the legislative intent was or would have been is at best a . . . judicial guess."[10] But the lack of absolute certainty does not warrant our saying: the Act is partially invalid; to permit it to stand in mutilated fashion would thwart the will of the Legislature; we therefore strike it down in its entirety. The functions of the courts would indeed be trivial if they served as mere automatons to record results produced in such a mechanical fashion. We cannot wash our hands of the problem that simply and, to mix the metaphor, dump it into the lap of the Legislature. Whether the Legislature will act, in the light of the partial invalidity of the statute, is for it to determine when it next meets. Meanwhile, we should be derelic in our duty if we did not in the interim make a painstaking effort to determine the legislative intent by the most accurate guess possible under the circumstances.

And in making this effort, we must bear in mind that "the words of Cardozo, J., 'The whole tendency during recent years, at least in this court, has been to apply the principle of severance with increasing liberality' undoubtedly express the viewpoint of a majority of the courts."[11] This

---

[9] Sutherland, Statutory Construction (3rd ed., Horack), p. 198.

[10] Sutherland, *supra*, p. 184.

[11] Sutherland, *supra*, p. 198, quoting from *People* v. *Mancuso*, 175 N.E. 177 (N.Y. 1931).

liberality is founded on the doctrine that "Laws are not to be sacrificed by courts on the assumption that legislation is the play of whim and fancy . . . Our right to destroy is bounded by the limits of necessity. Our duty is to save unless in saving we pervert." [12]

Another guidepost on this problem of statutory construction must be examined. "In the absence of . . . a . . . [separability clause], the presumption is that the legislature intends an act to be effective as an entirety . . . The effect of the statutory declaration is to create in the place of the presumption just stated the opposite one of separability." [13] (Matter in brackets ours.) However, it is difficult, if not impossible, to ascertain how much this terminology of presumptions has influenced the actual results in particular cases. Certainly the lack of a separability clause, as in the instant case, is not necessarily decisive or even controlling. Indeed, the district judge said here that he would have held the entire Act invalid even if it had contained a separability clause. It purports to set up objective criteria; yet, like all the learning in this field, it undoubtedly lends itself to subjective judgment. Since a separability clause "is an aid merely; not an inexorable command",[14] one finds it sometimes noticed, sometimes passed over. (*Frost* v. *Corporation Commission,* 278 U. S. 515; *Lynch* v. *United States,* 292 U. S. 571, 586). "In clear cases the presumptions are unimportant"; [15] and no one can categorically say that tips the scales in favor of one side or the other. And the final answer is that "under either rule, the determination, in the end, is reached by applying the same test—namely, What was the intent of the law-makers?" [16]

A final caveat, already adverted to, is appropriate at this juncture. Some of the cases lose sight of the fact that the

---

[12] *People ex rel. Alpha Portland Cement Co.* v. *Knapp et al., supra,* pp. 207-8.
[13] *Williams* v. *Standard Oil Co.,* 278 U.S. 235, 241-2.
[14] *Dorchy* v. *Kansas, supra,* p. 290.
[15] Stern, *supra,* p. 125.
[16] *Carter* v. *Carter Coal Co.,* 298 U.S. 238, 312.

test is not what the Legislature intended. That obviously can no longer be effectuated in view of the admitted invalidity of some provisions of the statute. The test is rather what the Legislature would have intended if it had known that certain provisions of the statute as originally enacted were invalid.[17]

With these preliminary considerations in mind, we turn to the facts of the instant case. Citing familiar cases on this subject (*Johnson* v. *State,* 37 A. 949 (N.J., 1897); *Riccio* v. *Hoboken,* 55 A. 1109 (N.J., 1903); *McFarland* v. *City of Cheyenne,* 42 P. (2) 413 (Wyo., 1935); *Hill* v. *Wallace,* 259 U.S. 44[18]; *Williams* v. *Standard Oil Co.,* 278 U.S. 235; *Carter* v. *Carter Coal Co.,* 298 U.S. 238; *P. R. Tobacco Corp.* v. *Buscaglia,* 62 P.R.R. 782, 799), the district court concludes that the other provisions of Act No. 33 are so intimately related and interwoven with the provision that the Speaker of the House and the President of the Senate shall be members of the committee to approve disbursement of the funds that when they are eliminated from the committee by judicial construction the Act as a whole must fall.

The lower court finds that "the clause appropriating funds is intimately related to the creation of the committee and the method of making the disbursements". The court first relies on the limitations written into the statute restricting the discretion of the committee to disburse these funds. These limitations, the district court asserts, are that the "calamities" for which these funds could be disbursed are expressly enumerated;[19] that those "calamities" had to result in "unexpected and unforseen public needs"; that the money could not be spent except for "the purpose of protecting the lives and property of the people, and the pub-

[17] Stern, *supra,* p. 98; Employers' Liability Cases, 207 U.S. 463; *Lynch* v. *United States,* 292 U.S. 571, 586.

[18] But compare *Chicago Board of Trade* v. *Olsen,* 262 U.S. 1, which "afford[s] a striking example of the difficulty of reconciling decisions on separability". (Stern, *supra,* p. 111.)

[19] But see *infra* on this point.

lic credit''; that the statute specifically prohibited ''the use of the fund, without the previous consent of the Legislature, for new governmental activities, nor to directly or indirectly increase or supplement appropriations voted to meet ordinary services of the government''.[20]

But the restrictions with which the Legislature hedged disbursements from the Emergency Fund might just as easily have been set up as limitations on executive spending. That is to say, applying the test which governs in these cases —if the Legislature had known it must surrender the power to disburse these funds to the executive branch, the fact that these limitations on expenditures were written into the statute does not necessarily point to the conclusion that under those circumstances the Legislature would not have passed the statute at all. Indeed, if anything, such rigid restrictions point to partial rather than complete invalidity: a legislative body might well be persuaded to give a committee on which it was represented *carte blanche* to disburse funds, especially if one of its members had an effective veto power; whereas if the Legislature were forewarned that its members could not serve, such rigid limitations would be more apt to be incorporated in the statute. As a matter of fact, these are the very restrictions on which the district court relied in properly holding, as we have seen, that Act No. 33 did not constitute an invalid delegation of legislative power—that the Legislature has set up in that Act sufficient standards to guide the executive and to enable him to fill in the details in administering the Act (*Luce & Co.* v. *Minimum Wage Board*, 62 P.R.R. 431; *People* v. *Martinez*, 62 P.R.R. 706). We must confess that these provisions of Act No. 33 lead us to exactly the opposite conclusion as that reached by the district court.

The district court also relied on the provision of the statute that it took four votes·on the five-man committee to

---

[20] Matter in quotations in this paragraph taken from § 4 of Act No. 33.

disburse funds. This meant, of course, that the expenditure of any funds must be approved by at least one legislative member. From this the district court concludes that "the Legislature never would have consented to permitting the money to be spent without the participation and previous *approval* of one of its presiding officers. To the legislators it was just as, if not more, important to select the persons composing the disbursing committee as to make the disbursements themselves."

It must be admitted at once that the provision of the Act that the committee could take no action without the vote of at least one of the legislative members was an important provision of this statute. It demonstrates the determination of the Legislature to give its members a powerful voice in the disbursement of these funds. But it is sleight-of-hand thinking to find, without any further examination, that this four-vote provision is decisive of the question into which we are now inquiring. This argument, when examined closely, is in effect an assertion that the provision of the statute calling for legislative members drops out of the statute as invalid; that the requirement of a four-vote provision *remains* in the statute; that the committee now consists of only three members; and that the statute as a whole therefore fails because a three-man committee can never pass a resolution requiring four votes.

The flaw in this reasoning seems obvious to us. Both provisions—legislative membership and the four-vote requirement—stand on the same footing. Each serves to emphasize the original purpose of the Legislature to participate in the disbursement of the funds it had appropriated. But once it is held that this method of disbursement is unconstitutional, we are unable to follow the reasoning of the lower court that the four-vote provision is controlling. On the contrary, that provision is, indeed—to talk the language of the cases—"intimately related to" the provision of membership on the committee by the legislators. If two members

of the committee cannot constitutionally serve and the provision therefor must be stricken from the statute, the related provision that the committee—originally a five-man committee—cannot function except by a four-vote majority must obviously also drop out of the statute. But the question still remains—would the Legislature nevertheless have wished the statute to remain in effect without both these forbidden provisions, if it had known at the time of its enactment that they could not be included therein?

Although drawing liberally on the welter of case law on this subject, the district court dismisses with a paragraph the second holding of *Springer* v. *Philippine Islands, supra,* which seems the closest to our case of all those we have examined. And in view of the difficulty of reconciling the decisions in this field and of the tendency of the courts to decide each case of this nature on its facts, we are fortunate in finding that the *Springer* case is almost on all fours with this case.

The *Springer* case involved actions in the nature of *quo warranto* challenging the right to hold office of directors of certain corporations in which the Philippine Islands owned substantially all of the capital stock. Two of these corporations were The National Coal Company and The National Bank. A statute was passed providing that the voting power of all the government-owned stock shall be vested exclusively in a committee, consisting of the Governor-General, the President of the Senate and the Speaker of the House of Representatives. Suits were brought to oust directors who had been elected by the two legislative members. As already noted, the acts in question were held invalid as vesting executive functions in members of the Legislature. The district court correctly followed this holding.

But there was an additional holding of the *Springer* case, even more important for the purposes of this case. The opinion of the Supreme Court of the Philippines contains

an excellent restatement of the rule on partial invalidity in 50 Phil. 259, 292. Applying that rule to the facts of the *Springer* case, the court, through Mr. Justice Malcolm, said at p. 293: "The Legislature has lawfully provided for a National Coal Company and a committee to vote the government stock in that company, but has unlawfully provided for two of its members to sit in the committee. Would this court be doing violence to the legislative will if the voting power be continued solely in the hands of the Governor-General until different action is taken by the Legislature? We conclude that we would not for the reason that the primordial purpose of the Legislature was 'to promote the business of developing coal deposits . . . and of mining . . . and selling the coal contained in said deposits' . . . The incidental purpose of the Legislature was to provide a method to vote the stock owned by the Government in the National Coal Company."

We recognize that this was not simply the question of the failure of an appropriation, as might be argued here, and that the Supreme Court of the Philippines bolstered its conclusion by stating at pp. 294–5 that "On the assumption, however, that the entire provision authorizing the voting committee be considered as wiped out, yet we think it would still devolve on the Governor-General to protect the public interests and public property. He is made responsible for the execution of the laws, and he would be unfaithful to that trust if, through inaction, instrumentalities of government should fail to function and government property should be permitted to be dissipated."

The district court was apparently relying on this last quoted point when it distinguished the additional holding of the *Springer* case as follows: "The case of *Springer* v. *Philippine Islands, supra,* is different. There the Philippine Government was the owner of some stock and a controlling committee was created to vote it. With the legislators

eliminated somebody must have that right and an executive function of government being involved, the only one who should exercise it is he on whom the Philippine Organic Act conferred *supreme executive power."*

But if the opinions in this case are carefully examined, we find that this narrow ground which, we agree, would be sufficient to sustain the conclusion of the courts therein, is by no means the exclusive basis for that decision. On the contrary, as we have seen, the Philippine Supreme Court stated at considerably greater length, before reinforcing its conclusion with a brief statement of the aforesaid narrow ground, its broader holding that the governmental executive function of owning and controlling the stock was the principal purpose of the legislation; that the method of voting it was only incidental to that main purpose; and that the courts were therefore bound to serve that main purpose by saving the remainder of the statute, provided it could be done by merely eliding the offensive provisions and leaving in effect a workable statute.

The Supreme Court of the United States, in affirming the judgments, used broad language. The Court says at pp. 205–6: "And we are further of the opinion that the powers asserted by the Philippine Legislature are vested by the Organic Act in the Governor-General. The intent of Congress to that effect is disclosed by the provisions of that act already set forth. Stated concisely these provisions are: that the supreme executive power is vested in the Governor-General, who is given general supervision and control over all the departments and bureaus of the Philippine Government; upon him is placed the responsibility for the faithful execution of the laws of the Philippine Islands; and by the general proviso, already quoted, all executive functions must be directly under the Governor-General or within one of the executive departments under his supervision and control. These are grants comprehensive enough to include the powers at-.

tempted to be exercised by the legislature by the provisions of law now under review.[21]

Our dilemma is not so acute as that facing the courts in the *Springer* case. There a three-man board was in effect wiped out with the elimination of the two legislative members, leaving the Governor-General alone to serve. It was therefore necessary to search the Organic Act and find within it various props, including the supreme executive power, to uphold the right of the Governor to act alone. Here we need not fall back on the provisions of our Organic Act which might conceivably justify the disbursement of money appropriated by the Legislature without any specific designation of a particular department or other executive agency which, under the supervision of the Governor as required by our Organic Act, would disburse the funds in question. We can save the legislation—which it is our duty to do if we find that is what the Legislature would have intended if it had known that its provision for legislative

---

[21] It would seem at first blush that whether an insular statute is partially or wholly invalid is undoubtedly a local question. Stern points out, *supra*, pp. 91–3, that "... Whether or not a state law should be [so] interpreted ... is a matter of statutory construction, and the duty of construing state statutes rests upon the state courts and not the federal. [Indeed] ... In recent cases appealed from the state courts, the Supreme Court has adopted the technique of remanding the case to the state court for determination of the issue of separability." Yet the opinion in the *Springer* case is not couched in the familiar language of upholding the interpretation of the territorial court on local questions unless it is patently erroneous. On the contrary, the Supreme Court, by predicating its decision on the intent of Congress in various provisions of the Organic Act, seems to be exercising its independent judgment in affirming the Philippine Supreme Court. This may indicate that the court may have felt that decision of the case depended, on final analysis, on an interpretation of the Organic Act. If that be so—by a parity of reasoning—the same situation may exist herein. and this case may therefore conceivably involve a Federal question. If that were definitely established, we might be compelled, whether we agreed with it or not, to follow the *Springer* case (*Gallardo* v. *González*, 143 F.(2) 947 (C.C.A. 1st, 1944); cf. *Puerto Rico* v. *Rubert Co.*, 309 U.S. 543, 549–50, *De Castro* v. *Board of Commissioners of San Juan*, 323 U.S. 451). But that is an interesting by-path which we need not explore in this case, in view of the fact that we disclaim any desire to disavow the second holding in the *Springer* case. (See *Buscaglia* v. *District Court*, 64 P.R.R. 11, decided July 28, 1944, as compared with *Massachusetts* v. *Mellon*, 262 U.S. 447).

members on the committee with the concomitant provision that one of the legislator's vote was required for action was invalid—by a process which is considerably closer to the original legislative intent than that used in the *Springer* case. In the latter case elimination of the two legislative members left the executive functions in the hands of the Governor-General alone. In our case elimination of the provisions relating to the legislative members makes § 7 of Act No. 33 read as follows: "Disbursements from the Insular Emergency Fund shall be made only pursuant to a resolution adopted by the affirmative vote of . . . a committee made up of the following . . . members: the Governor, . . . the Treasurer and the Auditor of Porto Rico."

Without violating the rule that performance of executive functions must be lodged in members of the executive branch of government, the statute would as thus construed nevertheless still retain some slight check on the Governor—which is wholly lacking in the result reached in the *Springer* case— by inclusion on the committee, as the Legislature intended, of the Auditor, who is appointed, not by the Governor, but by the President, to whom he is ultimately responsible rather than to the Governor. Indeed, it is difficult to conceive of a more suitable committee. After all, we have held that the Legislature must lodge this power in the executive branch. Since all executive power under our Organic Act stems from the Governor, there is certainly no disruption of the legislative policy in retaining him as a member of the committee. And the Auditor and Treasurer are the fiscal officers of the Government and are the only department heads apt to be disinterested in obtaining allocations of funds for projects to be administered by their departments. They are therefore peculiarly appropriate persons to pass on such proposals with a detached, impartial, expert point of view. But even if the committee as thus constituted were less than perfect, we should be disinclined to undo the handiwork of the

Legislature more than we have unless and until that body speaks for itself.

That it is our duty to preserve Act No. 33 in this manner becomes even clearer when we examine the purpose of this Act. As we have seen, the test laid down in all the cases, but particularly in the *Springer* case, would seem to be: Is the primary purpose of this Act the expenditure of funds to meet public calamities, with the method of spending it important but incidental to the main purpose, or is the primary purpose the method of spending that money? Stated in this form, the answer would seem to be obvious. Here we have a statute with a clearcut purpose—a continuing, permanent appropriation of reserve funds held in trust and available instantly to meet unexpected and great public needs. This purpose is not affected in the slighest by the change constitutionally required in the method of expending such funds. Are we to say that the method of spending it so transcended —or even equalled—in importance its purpose that the Legislature would have deliberately said, if the matter had been brought to its attention, if this tropical island be struck by one of the devastating hurricanes which our history shows originate in this area and sweep across this island and leave behind a stricken community, that it wished the $8,000,000 trust fund, which had been earmarked by it to repair such ravages, to be left intact in the Treasury because its members cannot constitutionally participate in its disbursement? We are not prepared to attribute any such callous attitude to the Legislature. If that is the attitude of the Legislature, it will quickly manifest itself when the Legislature next meets. Until that occurs, we prefer to believe that the Legislature meant what it said on the face of this legislation; namely, that it was primarily interested in meeting the public needs caused by great and unexpected calamities; that it preferred that two of its members have a voice in the expenditure of that money; but that if this were not possible,

it would have desired that the workable statute which still remained be put into effect in order that this community might have the relief which it had specifically provided for such contingencies.

The time has long since passed when the power of the government to relieve the distress of a whole people is grudgingly interpreted by the courts (See *Buscaglia* v. *District Court, supra,* where we held that relief expenditures by the government are "necessary for the support of the government"). Moreover, to strike down a statute completely because one of its provisions cannot be put into effect is a radical step. We prefer the more conservative approach of leaving the statute in effect with the objectionable provision excised. Certainly that is what the cases show most courts have done when faced with this problem: to strike a statute down as a whole for partial invalidity is the exception rather than the rule. In the great majority of the cases the courts salvage the remainder of the law.[22]

How far the courts will go in enforcing the doctrine of partial validity was demonstrated by what the Supreme Court actually did in the *Springer* case. There, we have seen, a board of three—the Governor-General, the Speaker of the House, and the President of the Senate—was reduced by the courts to the Governor-General alone. The courts thus permitted the executive functions involved therein to be performed by the minority of the board, the Governor-General alone. An argument analogous to the four-vote argument made here was presumably made in that case and rejected. That is to say, if legislation is not fatally distorted by substituting one man for a three-man committee, by the same token a three-man committee may replace a five-man committee which by law could act only with a four-vote majority. In each instance a minority of the group as originally constituted is now enabled to take executive action. Also, what is more important, there the Supreme Court of the United

---

[22] Stern, *supra,* p. 107.

States felt that the primary purpose of operating banks and coal companies by the government must be saved by holding the statute only partially invalid, despite such an extreme change in the executive machinery. Are we to say that our legislature would not have wanted a similar decision on a question involving relief of the whole community at a time of disaster? Surely the policy of our statute would be more nearly attained by partial validity as in the *Springer* case rather than by complete nullification of the law. Who would be heard to say that such a procedure is justified to operate a coal· or banking business, but that relief measures for a community beset by a calamity may not be similarly handled?

The district court also reasons as follows: "It is no secret, and we take judicial notice thereof, that the appropriations for the War Emergency Program failed to pass at the last session of the Legislature precisely because of the differences between the Senate and the House as to the manner of constituting the body to administer the fund. *We are convinced that the Legislature would not have made the appropriations without having participation in the manner of spending the money* . . . We cannot believe that the Legislature would have approved a law whereby the disbursements would be made by the Governor, the Treasurer, and the Auditor only. We are therefore faced with a situation identical to that of *People* v. *Tremaine, supra,* . . ." (Italics ours.)

It is somewhat unusual to ascertain legislative intent as of 1932 by the attitude of a different Legislature in 1944 toward a different piece of legislation. But accepting *arguendo* that test as a proper measuring rod of legislative intent, we find that the split in 1944 was not of the same kind: neither the House nor the Senate majority was making an effort to impose on the other legislative branch the unconstitutional condition that its members shall sit on the disbursing committee to be placed in charge of that program. On the con-

trary, the split was over a wholly different question: the qualifications of members of the proposed Board. *Buscaglia* v. *District Court, supra.* But what is more important is that the record in that case does disclose a fervent dispute as to the constitution of the spending board. If under those circumstances a bill had been finally enacted which was unconstitutional so far as the membership of the board was concerned, there would, we concede, be considerable basis for agreement with the position of the lower court that the Legislature intended that if such a provision could not remain intact in such a statute, the Act as a whole should fail.

But here we have no such legislative history. Nothing has been called to our attention showing any undue interest by the legislative branch in the composition of the committee to administer Act No. 33. The Legislature, of course, evinced a desire to have its presiding officers sit on the committee. But it is by no means clear that this wish of the Legislature in 1932 was so extreme that it would have chosen to leave the island prostrate from the effects of hurricanes and other calamities rather than relinquish its participation in the expenditure of the funds it had appropriated for this purpose. Indeed, it might be added, it is the legislative history of strife and the insistence of the Legislature in usurping executive functions, with a running controversy for some time, which seems to have motivated the Courts of Appeals of New York in deciding *People* v. *Tremaine*, 168 N.E. 817 (N.Y., 1929).[23]

The district court relied so heavily on the *Tremaine* case that we believe it desirable to examine that case in detail. We begin by pointing out that the *Tremaine* case has two holdings. And here again, as in the *Springer* case, the lower court chose to follow only one of these. One of the holdings of that case was that § 139 of the State Finance Law was void in so far as it provided that "When, by act of

---

[23] Moreover, even in the *Tremaine* case, as we shall see, other appropriations were continued in effect without the void conditions.

the Legislature, a state department is created or reorganized . . . and a lump sum is appropriated for its maintenance and operation . . . no moneys so appropriated shall be available for payments for personal service . . . until a schedule of positions and salaries shall have been approved by the Governor, the chairman of the finance committee of the Senate and chairman of the ways and means committee of the Assembly . . .''. After using reasoning with which we are already familiar in this case, the court says at p. 822:

"It follows that so much of the appropriation bills in question as confers powers on the legislative chairmen to approve segregations is unconstitutional and void. As the controversy clearly indicates that the legislative purpose would be thwarted by permitting the power of approval to remain in the Governor alone, all the provisions for the approval of segregations in section 139 of the State Finance Law must be held void. . . . *So far as the appropriations themselves are concerned, they may be separated from the unconstitutional parts of the statutes, and are therefore the law of the state.* Both Legislature and Governor clearly intended that the departments should be properly maintained in any event and provided therefor. *The Legislature may not attach void conditions to an appropriation bill. If it attempts to do so, the attempt and not the appropriation fails.* . . . The State Finance Law, § 139, and the vetoed section 11 of chapter 593 of the Laws of 1929, and all similar segregation provisions in the appropriation bills of 1929, are therefore unconstitutional and void, although the appropriations themselves, with the exception hereinafter noted, are valid.'' (Italics ours.)

The lower court fails to cite the above-quoted portion of the *Tremaine* opinion. Instead it relies on the very next paragraph, which reads as follows (pp. 822–3):

"One such appropriation bill calls for special consideration. The legislative power appropriates money, and, except as to legislative and judicial appropriations, the administrative or executive power spends the money appropriated. Members of the Legislature may not be appointed to spend the money. It follows that so much of the appropriations in chapter 93, Laws of 1929, for the erection of public buildings made to and to be expended by the state office

site and building commission, created by chapter 5, Laws of 1926, and composed of the Governor, as chairman, the temporary President of the Senate, the Speaker of the Assembly, the chairman of the Senate finance committee, the chairman of the ways and means committee of the Assembly, the superintendent of public works, and the state architect, are affected with the vice of invalidity. A majority of the members of such commission are legislative officers acting ex officio, and are thus holding invalid civil appointments of an administrative character from the Legislature. When they are deprived of their offices or functions as members of such commission, the commission is eviscerated and invalidated, at least so far as its money-spending functions are concerned. . . . Such items are $550,000 for the state office building af Buffalo, and $3,250,000 for the state office building in New York City.''

The only reason the New York Court of Appeals gives for vitiating this one item out of the many it left intact in that case is that ''A majority of the members . . . are . . . holding invalid . . . appointments . . . When they are deprived of their offices . . . the Commission is eviscerated . . .''. But that, as we have seen, did not prevent the Supreme Court of the United States from permitting the Governor-General alone to take over the functions of a three-man committee. Moreover, in the instant case, the three executive members, a majority of the committee, remain in office, enabling the committee to function, although it is true in our case that the majority contemplated by the statute for affirmative action—four—is no longer possible. In any event, the shortest answer to this argument, as we have already seen, is that the majority feature is not controlling or even decisive—the primary purpose of the Legislature in enacting the statute remains paramount.

But even assuming we agree with the *Tremaine* case, why should the situation herein be assimilated to the building of two office buildings rather than to the ordinary appropriations of the regular departments of government? The instant case involves a large trust fund which is a permanent, continuing appropriation which is constantly being replen-

ished and increased [24] and which, it was envisaged by the Legislature, would always be instantly available to take care of the onslaught of the calamities which experience has shown are occasionally visited upon this community. Indeed, it might well be contended that a permanent, continuing appropriation of this nature rises to a higher dignity than the ordinary appropriation bills, since this enables the committee to expend its funds without coming to the Legislature therefore annually. And although spent only intermittently, such an appropriation is certainly as important as those "necessary for the support of the government." (*Buscaglia* v. *Court, supra.*) It is therefore apropriate to argue that if, for example, provision were regularly and annually made in the departmental budgets of the Interior and Agriculture Departments for a trust fund to be available for the contingencies enumerated in Act No. 33, any conditions therein that members of the Legislature should sit with the two Commissioners and the Governor to disburse the same would—in the language of the *Tremaine* case—be "void conditions to an appropriation bill", but nevertheless "the appropriations themselves . . . [would be] valid."

The pitch of the matter is that we find nothing in the *Tremaine* case which would enable us to impute to our Legislature the intention that, despite all the rigid limitations and restrictions written into our Act to guide, limit and, if necessary, to stay the executive hand-controls which the lower court and the parties readily concede are more than sufficient to set up proper legislative standards for executive conduct and which could by no stretch of imagination be characterized as a blank check—the Legislature, when told that its final precaution of direct participation in the disbursement of funds was unconstitutional, in effect did say, or would have then said, in that event this whole Act, providing for emergency relief because of calamities such as hurricanes, wars, plagues, and earthquakes, shall be void.

---

[24] Section 3 of Act No. 33.

■ The next contention made by Rodríguez Pacheco was that, even assuming Act No. 33 was partially valid, the allocation of funds to relieve the community from the effects of a drought was not authorized by the terms of § 4 which provides that the "Insular Emergency Fund shall be applied to meet . . . unforseen public needs caused by *calamities, such as wars, hurricanes, earthquakes, and plagues* . . .". (Italics ours). The district court refused to pass on this contention, in view of the fact that it found the Act totally invalid. This was proper judicial self-restraint. But as we have upheld the Act in part we are required to examine this contention.

We find ourselves little impressed by this point. Ample testimony was adduced before the lower court of the severe nature of the drought in Puerto Rico during the past year and of its disastrous effect on our entire economy. Indeed, this situation was so notorious as not to require any testimony—we take judicial notice that it was the most intense drought in our history since American sovereignty. Its impact was and still is one of the facts of life of this community. With this the taxpayer does not quarrel. Rather he asserts that this fact is irrelevant, since § 4 does not specifically list droughts as one of the calamities contemplated by the Legislature as calling for disbursements from the Emergency Fund. To interpret § 4 in this restrictive manner would be indeed to interpret a broad social measure grudgingly. Fortunately, no such narrow interpretation is required by the language of the Section itself. Even the taxpayer concedes that a drought is a "calamity". And we find nothing in the Section confining relief under the Act exclusively to those calamities specifically recited therein. On the contrary, it is clear that the calamities set out in the statute are enumerated only as illustrative and by way of example. That is obviously the meaning of the phrase "such as" before the list of calamities found in the statute. This was constructive foresight on the part of the Legisla-

ture. Calamities by their nature are unexpected. It would indeed be risky business to attempt to cover in detail in such legislation every possible contingency. If we were suddenly afflicted with a raging fire, a flood, dynamite explotions, or a sudden air raid in peace time, would anyone raise his voice against the use of the Emergency Fund by the committee to come to the rescue of the community? We see no difference between those situations and that of the drought of the past year. None of them is listed in the examples of calamities given in § 4. But all of them fall without question into the category of calamities of which those specifically listed are given merely as examples. (See *City of Muskegon Heights* v. *Danigelis*, 235 N.W. 83 (Mich., 1931); *Rummens* v. *Evans*, 13 P.(2) 26 (Wash., 1932)).

This conclusion is in no way affected by the fact that Act No. 33 was amended in 1942 by inserting wars as one of the calamities specifically listed. Perhaps the Legislature felt that since war, unlike other calamities, is not an act of God, it was desirable out of an abundance of caution to list it specifically. What is more likely is that it was written into the statute as an expression of patriotism and of the determination of local authorities to do our share in the war effort. In any event, for our purposes, it merely took its place as one of the illustrative calamities and does not invalidate the reasoning herein.[25]

Finally, the attacks on the tenure of the Acting Governor and the validity of his action in voting as such on the resolution of May 22 require only brief consideration. We do not stop to examine the many questions raised by both parties in this connection, in view of the fact that the record shows that of the three members of the committee who could validly serve, two—the Auditor and the Treasurer—voted

---

[25] Whether the means adopted by the Committee to remedy the effects of the drought were the best under the circumstances is not a matter within our province to determine. No one asserts they were wholly unreasonable. We are therefore not at liberty to substitute our judgment for that of the committee on a matter which is obviously one of administrative discretion.

for the resolution. Since the actions of a three-man committee are under ordinary rules controlled by two members thereof, we see no purpose in inquiring into these questions. This is not to say that insular executive agencies of which the Governor is a member are ordinarily to be encouraged as a matter of administrative practice to meet without him, merely because they have the power to outvote him. But here a man did sit who purported to vote as Acting Governor. Also, subsequently the Governor permitted the Commissioners of Agriculture and Interior, who serve at his pleasure, to expend these funds pursuant to the resolution until restrained by the lower court; and the Governor himself has appeared as a party in this case, through the Attorney General, to defend the resolution of the committee. Under those circumstances there is no basis for the courts to interfere with action which had the approval of a majority of the committee.

The order of the district court granting a preliminary injunction will be reversed and the case remanded for further proceedings not inconsistent with this opinion.