OPINION OF THE COURT
Bertram Katz, J.
At issue in this CPLR article 78 petition, one of first impression, is whether a not-for-profit corporation can enforce *366 payment of undistributed moneys appropriated under the member item system by the State Legislature. For reasons that follow, this court finds that it cannot.
The Alliance for Progress, Inc. (AFP) is a not-for-profit corporation founded by Isreal Ruiz, Jr., the New York State Senator from the 32nd Senatorial District. AFP has as one of its chief purposes the rehabilitation of housing in the Senator’s district. The Senator has been instrumental in obtaining funding for AFP through the Neighborhood Redevelopment Demonstration program (Neighborhood Redevelopment), administered by respondent New York State Department of Housing and Community Renewal (DHCR). The gist of AFP’s claim is that funds in the amount of $562,500 earmarked for AFP, and specifically appropriated over a period of three years by the State Legislature for AFP, are being withheld by respondents DHCR and the New York State Division of the Budget in furtherance of a political vendetta against Senator Ruiz, and contrary to the State Constitution and the powers of appropriation reserved to the legislative branch therein. A judgment is also sought directing respondents to confirm in writing the forgiveness of the balance of two loans in the amount of $197,200 made by DHCR to AFP, which loan forgiveness was authorized in Laws of 1985 (ch 764, § 2).
The respondents DHCR and the Division of the Budget have moved for a judgment pursuant to CPLR 3211 (a) (2), (5) and (7) and 7804 (f) dismissing the petition upon the grounds that the court lacks subject matter jurisdiction over the claims concerning the 1985-1986 fiscal year, that the remaining claims fail to state a cause of action, and that the claim concerning the 1986-1987 fiscal year is barred by the Statute of Limitations.
Of chief importance in this case is the nature and effect of the so-called "Green Book” or Legislative Committee Report,[1] a document which memorializes the agreement reached by the members of the State Legislature under the "member item” system.
The State budget for the fiscal years in question, 1985-1986, 1986-1987, and 1987-1988, made only lump-sum appropriations for Neighborhood Redevelopment. The Green Book breaks *367 down, or segregates, these lump sums into smaller amounts which are distributed by members of the Legislature, by agreement and compromise, to fund individual organizations in their respective districts, such as AFP. In the area of Neighborhood Redevelopment, the State budget called for lump-sum appropriations of $5,789,700 in fiscal year 1985-1986, $5,776,775 in fiscal year 1986-1987, and $5,736,700 in fiscal year 1987-1988.
The Green Book, in fiscal year 1985-1986 indicated a member item allocation of $250,000 to AFP. The cover letter submitted with the Green Book for that year states in pertinent part as follows:
"Dear Governor Cuomo:
"In accordance with the established intent of Article 7, Section 7 of the Constitution of the State of New York, we submit for your consideration the Report of the Fiscal Committee on the Executive Budget for the fiscal year 1985-86.
"Set forth in this document are the general and specific findings of the Senate Finance Committee and the Assembly Ways and Means Committee concerning the estimates of proposed expenditure plans for the overall purposes of the State Government which are contained in your Executive Budget for the 1985-86 fiscal year. The proposed expenditures are consistent with estimates of revenues for the 1985-86 State fiscal year. These Legislative findings are being submitted to assist you in the administration of the State Government”.
Article VII, § 7 of the NY Constitution, which is referred to in the cover letter, provides that no money shall be paid out of the State treasury or any of its funds, or any of the funds under its management except in pursuance of an appropriation by law, and that every law making a new appropriation or continuing or reviving an appropriation shall specify the sum appropriated and the object or purpose for which it is to be applied.
A contract was subsequently entered into by representatives of AFP and DHCR on February 13, 1986, and approved by the State Comptroller on March 15, 1986. The contract, which was for the period of April 1, 1985 through March 30, 1986, provided that $250,000 would be paid to AFP in consideration of its continued efforts to rehabilitate and manage housing in the Senator’s district.
The following year, fiscal year 1986-1987, an additional $250,000 was listed as an allocation to AFP in the "Green *368 Book”. By letter dated April 1986 DHCR notified AFP that it had received an appropriation in the amount of $250,000 and upon compliance with DHCR procedures, the completion of certain forms, and the preparation of a contract, including the approval of the Division of the Budget and of the State Comptroller’s office, the funds would be released to AFP. However, approval of this allocation was subsequently withheld by the Division of the Budget pending completion of an investigation of AFP by the Attorney-General’s office. No contract was entered into for fiscal year 1986-1987. A separate audit of AFP was commenced by DHCR, however, and concluded without any finding of wrongdoing on or about April 1, 1987. Allegedly, to cover costs already incurred by AFP under the 1986 contract, on March 25, 1987, DHCR paid $187,500 of the total $250,000 authorized by the 1986 contract. The check itself was dated March 17, 1986, having been withheld pending the outcome of DHCR’s audit. The investigation by the Attorney-General is continuing, according to the papers submitted by the Attorney-General.
That investigation purportedly concerns charges made in 1986 that Senator Ruiz has improperly withheld information about personal financial stakes in the Neighborhood Redevelopment projects engaged in by AFP, and has violated the conflict of interest requirements of such projects, with specific reference to the renovated commeuial building near Yankee Stadium known as the Yankee Mall.
On August 23, 1988, as this opinion was being prepared, Senator Ruiz was indicted by a Federal Grand Jury on charges related to the Yankee Mall project, although State Attorney-General Robert Abrams announced that he did not expect that any indictments would result from the State Grand Jury probe of Senator Ruiz.
For the fiscal year 1987-1988, no reference is made to AFP in the Green Book, but AFP alleges that "separate instructions” were made by unnamed entities that $250,000 of the funds allocated in the budget to the Neighborhood Redevelopment program was pledged, as in the two preceding years, to AFP.
AFP has not disputed the fact, however, that the lump-sum appropriation for Neighborhood Redevelopment for that year, as specified in Laws of 1987 (ch 53, § 1, at 892), was originally $250,000 more than the sum total of allocations to individual recipients listed in that year’s Green Book. After newspaper *369 articles appeared suggesting that this discrepancy was indicative of a secret arrangement among State legislators to covertly fund AFP, the budget was amended to eliminate this $250,000 discrepancy.
The chief point of contention is whether "Green Book” allocations have the force of law, and whether they are enforceable as legislative appropriations. It is the position of AFP that the allocations in the Green Book taken together with the budget lump-sum appropriations and the subsequent passage of the budget into law establish the absolute entitlement of AFP to the funds as a matter of law. It is further argued that the Budget Director’s approval as a prerequisite of the release of such funds pursuant to State Finance Law § 49 is a mere ministerial act which cannot be used as a ploy to thwart the will of the legislative branch of government.
The court disagrees with these contentions. Section 49 of the State Finance Law[2] provides that lump-sum appropriations for personal services made by the State Legislature may be segregated and distributed only upon the approval of the Director of the Budget. The Director of the Budget and his duties are defined in section 180 of the Executive Law. "The head of the division of the budget shall be the director of the budget who shall be appointed by the governor and hold office during his pleasure * * *. It shall be the duty of the director of the budget to assist the governor in his duties under the constitution and laws of the state respecting the formulation of the budget and the correlating and revising of estimates and requests for appropriations of the civil departments, and also to assist the governor in his duties respecting the investi *370 gation, supervision and coordination of the expenditures and other fiscal operations of such department”.
The complimentary functions of the legislative and executive branches in the formulation of the budget were described in a related context by the Court of Appeals in Saxton v Carey (44 NY2d 545) whose pertinent observations bear reiteration at length: "Under our system of government, the creation and enactment of the State budget is a matter delegated essentially to the Governor and the Legislature. The Governor, as chief executive officer, has the responsibility and the obligation to ascertain the financial needs of the various departments and projects of the State government, and to submit to the Legislature for its consideration a budget and various appropriation bills incorporating those needs (NY Const, art VII, §§ 2, 3). It is for the Legislature to review that proposed budget, and to approve or disapprove of the various expenditures proposed by the Governor (NY Const, art VII, § 4). For the Legislature to intelligently fulfill its proper role, it is of course necessary that the budget be itemized, lest the Legislature simply be presented with a lump sum which could be spent at the discretion of the Governor * * *. The Constitution, however, does not prescribe any particular degree of itemization. * * * [T]he degree of itemization necessary in a particular budget is whatever degree of itemization is necessary for the Legislature to effectively review that budget. This is a decision which is best left to the Legislature, for it is not something which can be accurately delineated by a court. It is, rather, a function of the political process, and that interplay between the various elected representatives of the people which was certainly envisioned by the draftsmen of the Constitution. Should the Legislature determine that a particular budget is so lacking in specificity as to preclude meaningful review, then it will be the duty of the Legislature to refuse to approve such a budget.” (Saxton v Carey, 44 NY2d 545, 549-550, supra.)
The power to make segregations of lump-sum appropriations is an executive, not a legislative function. Notably, in People v Tremaine (252 NY 27) the Court of Appeals held that the legislative practice pursuant to former section 139 of the State Finance Law of delegating the power to committee chairmen to make and approve segregations of lump-sum appropriations was a legislative usurpation of a function of the executive branch, and an unconstitutional attempt to circumvent the line item veto power of the Governor. (NY Const, art IV, § 7.) *371 Moreover, general acquiescence in this practice did not render it constitutional. Having authorized a lump-sum expenditure, as opposed to a specific appropriation for a specified payee, the Legislature cannot control the manner in which the moneys are disbursed.
The Green Book itself was subjected to the scrutiny of the court in New York Pub. Interest Research Group v Carey (55 AD2d 274) which found that Green Book provisions do not have the force of law, but are mere recommendations unless the contrary intent clearly appears. In that case, the Green Book was attended by a letter of the legislative committees asking that "these budgetary findings be received as guidelines.” The court held the complaint therein legally insufficient as there was nothing which would lead the court to find that the Green Book was intended to have the force of law. Similarly, in the case at bar, the preparers of the Green Book report, in all three years, in accompanying letters, refer to the allocations as "findings”, not appropriations.
AFP argues that, notwithstanding the fact that the Green Books submitted by the legislative committees are couched in language that is advisory in tone, the practical effect is that the Green Book segregations have the force of law once the budget is signed by the Governor.
When the lump-sum appropriations are signed into law, the power of the Director of the Budget, it is asserted, becomes merely ministerial, his only function to see that contracts are executed and the moneys properly disbursed to the member item payees such as AFP.
The court finds that such an interpretation of budget’s function would constitute the same legislative usurpation of an executive function found unconstitutional in People v Tremaine (supra).
If the Green Book is accorded the force of law, it is difficult to imagine the Legislature choosing to enact a specific appropriation instead of proceeding by means of the Green Book.
In the case at bar, by petitioner’s interpretation, the executive would be forced to fund all member item organizations, even those about whom serious questions of impropriety have been raised, or in the alternative, veto the entire lump-sum appropriation for the Neighborhood Redevelopment program. Obviously, no Governor would punish 99% of the organizations about whom no questions have been raised in order to block funding for a single organization undergoing the scru *372 tiny of criminal investigation. This interpretation of the petitioner is also tantamount to vesting the legislative committees with the power reserved to the executive branch of segregating lump-sum appropriations, a practice found unconstitutional in People v Tremaine (supra).
No authority has been cited to the court by AFP to support their interpretation of legislative authority, except for bald references to "practical effects”. But practicalities, ruled the court in Tremaine (supra), must yield to constitutional mandates.
Also implicated is the constitutional provision requiring that no moneys be paid out of the State treasury except in pursuance of an appropriation by law (art VII, § 7) which must be strictly complied with in order to preserve the vitality of the separation of powers. In Anderson v Regan (53 NY2d 356), the Court of Appeals struck down the unconstitutional practice of the executive branch of placing Federal funds in the State treasury for "administrative convenience” and from there disbursing them directly to the various State agencies. Specifically, the funds were deposited in a "joint custody funds” within the treasury and under the dual control of the Comptroller and Commissioner of Taxation and Finance. In interpreting article VII, § 7 of the NY Constitution, the court noted that this appropriations rule was part of an effort by the Constitution’s framers to stabilize the financial management of the State, and to superimpose a measure of legislative control over the then-unbridled power of the executive branch to spend. Also cited was the need to ensure a measure of accountability in government and to maintain the delicate balance of powers that exist between the legislative and executive branches. "In our system, the right to establish and implement the policies of the State through the use of the spending power is shared by the executive and legislative branches, each of which has a distinct constitutionally defined role to play in the budget-making process (see Matter of County of Oneida v Berle, 49 NY2d 515, 522-523). The right of the executive branch to participate in the process is ensured by section 7 of article IV and sections 2 and 4 of article VII, which authorize the Governor to submit a proposed budget to the Legislature and to veto specific appropriation measures on a line-by-line basis. The right of the Legislature to participate is, in turn, ensured by its general law-making power (NY Const, art III, § 1; see, e.g., People ex rel. Simon v Bradley, 207 NY 529) and by its power to pass upon all expenditures from *373 the treasury in accordance with section 7 of article VII. When the appropriation rule is bypassed, as it presently is in the case of Federal funds, the Legislature is effectively deprived of its right to participate in the spending decisions of the State, and the balance of power is tipped irretrievably in favor of the executive branch.” (Anderson v Regan, 53 NY2d 356, 365-366, supra.)
Conversely, in the case at bar, if the veto power can be circumvented by the mere use of the Green Book device, then the executive branch is effectively deprived of its role in overseeing and implementing programs funded by the Legislature.
Finally, AFP’s interpretation of the approval function of the Director of the Division of the Budget as a mere rubber stamp for legislative Green Book appropriations would render section 49 of the State Finance Law a nullity, and again, infringe on the functions of the executive branch. (People v Tremaine, 252 NY 27, supra.) In the case of Neighborhood Redevelopment, the thicket of requirements that are a prerequisite to the release of funds, including the extensive conflict of interest guidelines set out by DHCR, thoroughly discredits this rubber-stamp analysis, and undermines the notion that Green Book allocations constitute an enforceable right once the budget is signed.[3]
The court finds that AFP has wholly failed to meet its burden of establishing its entitlement to relief upon the alleged enforceability of Green Book allocations for the fiscal years 1985-1986 and 1986-1987. (Matter of Fehlhaber Corp. v O’Hara, 53 AD2d 746.) As to the fiscal year 1987-1988, no *374 evidence whatsoever has been presented to the court which is even suggestive of an appropriation for that year, apart from newspaper articles, which far from supporting AFP’s contention, indicate that the budget was specifically amended to eliminate any possibility that a portion of the lump-sum allocation be distributed to AFP. (L 1987, ch 810, § 4, at 2989.)
Furthermore, the court agrees with the contention of respondent that the sole remaining claim in respect to the balance of $62,500 unpaid for the 1985-1986 fiscal year is purely contractual, and can be brought only in the Court of Claims. (Automated Ticket Sys. v Quinn, 90 AD2d 738, affd 58 NY2d 949; Kagen v Kagen, 21 NY2d 532; Court of Claims Act §9.)
Finally, that portion of the petition which seeks letter confirmation from respondents of the fact that two loans made to AFP in the sum of $197,200 have been forgiven by law, specifically Laws of 1985 (ch 764, § 2), is denied, as there has been no showing that writing such letters is a mandatory act that respondents are enjoined to do under the law. (See, Matter of Sullivan v Siebert, 70 AD2d 975.)
The court does not reach that portion of respondents’ motion which concerns the four-month Statute of Limitations as a bar to AFP’s cause of action for fiscal year 1986-1987, but notes in passing that there has been no proof of a requisite triggering demand and refusal. (CPLR 217; see, Austin v Board of Higher Educ., 5 NY2d 430.)
The court has considered the other contentions of AFP and finds them to be without merit.
For all of the foregoing reasons, the petition is denied in all respects and is hereby dismissed; the motion by respondents is granted accordingly.

. The Green Book, or Report of the Fiscal Committee on the Executive Budget, is prepared and submitted to the Governor by the Chairmen of the Senate Finance Committee and of the Assembly Ways and Means Committee.

. Section 49 of the State Finance Law provides as follows: "When, in any act, lump sum appropriations are made for personal service, or for maintenance and operation or for non-personal service, or for maintenance undistributed including personal service, other than such appropriations for the legislature or judiciary, and appropriations from proprietary or fiduciary funds, no moneys so appropriated shall be available for payment for personal service, or maintenance and operation or for non-personal service, or maintenance undistributed including personal service until a schedule of positions and salaries and the amounts to be available for other personal service classes of expenditure and for the expenses of maintenance and operation or for non-personal service shall have been approved by the director of the budget, and a certificate of such approval filed with the chairman of the senate finance committee and the chairman of the assembly ways and means committee and the state comptroller. Any such approved schedule may be amended, however, with the approval of the director of the budget and the filing of a certificate thereof with such officers above named.”

. However, the executive branch, i.e., the Governor and Director of the Budget, may not constitutionally impound funds duly appropriated. In Matter of County of Oneida v Berle (49 NY2d 515), where the Governor failed to line item veto any part of $26 million appropriated for sewage treatment, the Director of the Budget could not withhold his approval and allow $7 million of the funds to be impounded in the pursuit of a balanced budget. This was a usurpation of a legislative function by the executive branch, since the executive is bound to implement policy declarations of the Legislature unless vetoed or judicially invalidated. In this context, once appropriated, the funds had to be spent for the specified purposes, although pursuant to the requirements of the funded program.
Similarly, in the case at bar, the executive branch may not impound the lump-sum appropriations for Neighborhood Redevelopment for the fiscal years in which such appropriations were made, but must see that such funds are distributed to payees who meet the requirements set forth in that program, and for the purposes specified in the lump-sum appropriations, in agency rules and in the program legislation.